T & E INDUSTRIES, INC., Plaintiff,

v.

SAFETY LIGHT CORP., et al., Defendants.

Civ. A. No. 87–1088.

United States District Court, D. New Jersey.

Feb. 26, 1988.

Edward A. Zunz, Jr., Riker, Danzig, Scherer, Hyland & Perretti, Morristown, N.J., for plaintiff, T & E Industries.

Albert G. Besser, Hannoch Weisman, Roseland, N.J., for defendant, Safety Light Corp.

## OPINION

WOLIN, District Judge.

This is an action brought by T & E Industries, (T & E) pursuant to the Comprehensive Environmental Response, Compensation, and Liability Act of 1980 (CERCLA), 42 U.S.C. § 9601, *et seq.* The complaint seeks a declaration that defendants are liable for all necessary costs of cleanup and decontamination, consistent with the National Contingency Plan, of the site presently known as 422 Alden Street, Orange, New Jersey. In addition, T & E seeks a judgment for "response costs" already incurred, including the costs of prosecuting this action, and injunctive relief enforcing such judgment.

From approximately 1917 until 1926 the United States Radium Corporation (U.S. Radium) conducted radium extraction operations at its radium processing facility in Orange, New Jersey. U.S. Radium processed radium from carnotite ore which was transported by railroad to the facility in Orange. Utilizing a fractional crystallization process, U.S. Radium extracted approximately 80% of the radium from the carnotite ore. The radium was used for medical and commercial applications, including the manufacture of luminous paint which was applied to instrument dials, watches and other products.

The by-products of this operation consisted of solid and liquid waste. The liquid residue was disposed of through the Orange sewer system pursuant to permit. The solid by-products, more commonly known as "tailings", which contained small amounts of radium, were deposited onto vacant portions of the U.S. Radium property.

In 1926, U.S. Radium ceased all radium processing activities and permanently closed its facility in Orange, New Jersey. The property remained vacant until the mid–1930's when portions of the original facility were leased to various commercial tenants.

In 1943, U.S. Radium sold the Alden Street property to Arpin Products, Inc. After the purchase, Arpin constructed an addition to the rear portion of the building on the site over what it knew were tailings. Arpin subsequently sold the property in 1951 to Top Plastics, Inc. In February, 1952, Top Plastics sold the property to LaScalla Industries, Inc., who in turn sold the property to Henry Morrow.

T & E leased the premises from Henry Morrow in 1969, and after 5 years of leasing such, ultimately purchased it in 1974. At no time prior to the purchase of the property was T & E aware of the radiation problem which had been caused by the radioactive tailings being dumped on the property.

In March, 1979, the New Jersey Department of Environmental Protection (DEP) informed T & E that it believed that there were levels of radiation at the property which exceeded those occurring naturally. The DEP proceeded to install long term monitoring equipment to measure the levels of radon, radon progeny and gamma radiation. In November, 1979, the DEP advised T & E that excess levels of radiation existed at the site. Specifically, the DEP expressed concern as to the levels of radon and gamma radiation located in the vicinity of the building originally used by U.S. Radium, added to by Arpin, and at the time, occupied by T & E. On November 20, 1979, the Director of the DEP wrote a letter to T & E which directed T & E to begin "immediate remedial action."

Subsequently, T & E conducted its own tests to confirm the DEP's findings and to assess the effectiveness of interim remedial measures instituted to bring down the radon levels. T & E sealed all the cracks, expansion joints, and sewer drains in the oven room, which the DEP had specified as an area of concern. In addition, T & E tried to increase ventilation in the building by using five fans and a vent pipe. Although such actions by T & E helped to lower the radon level somewhat, such did not effectively keep the radon level down and did not reduce the gamma radiation level.

In March, 1981, T & E commenced a lawsuit against U.S. Radium in the Superior Court of the State of New Jersey, Law Division, Essex County (Docket No. L–41346–80). The complaint sought recovery of damages allegedly incurred as a result of U.S. Radium's dumping of radium tailings on the Alden Street property under several New Jersey common law theories.[1]

In December of 1983, T & E amended its complaint and sought to impose liability upon Safety Light Corporation and various other corporate defendants as alleged corporate successors to U.S. Radium.[2]

The amended complaint sought the identical relief from Safety Light as the original complaint against U.S. Radium had. Specifically, T & E sought the following relief:

1. All of the costs that T & E may be required to expend to effect the decontamination of or to clean up the premises (Fifth Count);

2. Monetary damages incurred due to the substandard interruption of T & E's business. (Second, Third and Fourth Counts);

3. All of the costs associated with T & E's relocation of its business. (Second and Third Counts); and

4. Monetary damages due to the diminished value of T & E's property. (Third and Fourth Counts).[3]

Prior to the trial, the Court granted T & E partial summary judgment declaring that (1) Safety Light is a "successor or continuation of U.S. Radium," and (2) U.S. Radium "placed hazardous wastes in the form of radium ore tailings" on the Alden Street property. The State Court also granted defendants request to bifurcate the claims against Safety Light from the claims against the other corporate defendants. Accordingly, the trial commenced on February 3, 1986 against Safety Light only, with all other claims to be tried against the remaining defendants only if T & E obtained a judgment against Safety Light.

---

1. These theories included strict liability, negligence, intentional or negligent failure to discover and warn, fraud, misrepresentation and reckless conduct.

2. In its answer to the amended complaint, Safety Light admitted that it is the corporate successor to U.S. Radium.

3. T & E broadly interpreted its claim for cleanup costs in the State Court to include indemnification for the "cost of all future cleanup that may be required by the State or Federal Government."

At the conclusion of T & E's case, the state court dismissed T & E's absolute liability claim for U.S. Radium's conduct between 1917 and 1926, holding that as of the date of the radium dumping, defendant did not know that such activity was dangerous. The Court also dismissed T & E's claims of fraud, misrepresentation, reckless conduct and punitive damages.

At the conclusion of Safety Light's case, Safety Light moved to dismiss T & E's 1943 and 1974–based claims. The trial court denied defendant's motion as it pertained to the 1943 conduct and reserved decision on the 1974–based claim.

On March 11, 1986, the jury returned a no cause verdict on the 1943 claim and a verdict for plaintiff on the 1974 claim, that U.S. Radium had been negligent in not warning T & E before its purchase of the property that the tailings constituted a potential risk to health or property.

Safety Light subsequently moved for judgment notwithstanding the verdict on the ground that U.S. Radium owed no duty to warn in 1974. T & E moved at the same time to set aside the order dismissing its absolute liability claims and sought a judgment for indemnification.[4]

The trial court denied T & E's post-trial motions and granted defendant Safety Light's motion to set aside the jury verdict, based upon the ground that the doctrine of *caveat emptor* barred T & E's 1974 negligence award. Judgment was entered in favor of all the defendants on May 29, 1986.

T & E filed a Notice of Appeal to the New Jersey Appellate Division on July 9, 1986.

On March 27, 1987, the same date that T & E filed its brief in the Appellate Division of the Superior Court, it filed its complaint in this action with the United States District Court for the District of New Jersey. As noted above, T & E's federal complaint seeks declaratory relief and response costs under § 107 of CERCLA, 42 U.S.C. § 9607.

On July 15, 1987 the defendants filed a motion to dismiss the complaint. On September 14, 1987, T & E filed a cross-motion for partial summary judgment against Safety Light. After numerous adjournments, for a myriad of reasons, these motions are currently before the Court.

As the motion for partial summary judgment is only relevant if plaintiff's complaint is not dismissed, this Court will address defendant's motion to dismiss first. Defendants contend that plaintiff's suit should be dismissed for several reasons. First, defendants contend that plaintiff's suit should be dismissed as it is barred by the New Jersey "entire controversy doctrine". Second, defendants contend that plaintiff's alleged response costs are not recoverable under CERCLA. Third, defendants argue that plaintiff's claim is barred by the applicable statute of limitations and finally, defendants submit that a mandatory injunction is not available to private parties under CERCLA.

### DISCUSSION:

#### 1. *Claim Preclusion.*

■ Defendants contend that New Jersey's "entire controversy doctrine" precludes the plaintiff from maintaining this action in federal court when a similar action has previously been brought by plaintiff and addressed by a state court. While agreeing with defendants' assertion that the deliberate fractionalization of lawsuits in order to provide a party with "two bites at the apple" is abhorable and impermissible under the "entire controversy doctrine", this Court finds that as plaintiff's current claim could not have been brought in the prior state court action, it is constrained to hold the entire controversy doctrine inapplicable.

---

**4.** Safety Light opposed T & E's common law claim for indemnification on the ground that the claim was not asserted in the amended complaint and that no right to common law indemnity could arise until after the government imposed the cleanup costs on T & E. Safety Light also argued that an "indemnification agreement" imposed by common law would be ineffective under CERCLA and advised the State Court that T & E's remedy against defendant is properly found in § 107(e)(2) of CERCLA.

The preclusive effect of a state court judgment in a subsequent federal lawsuit generally is determined by 28 U.S.C. § 1738 which provides:

The .... judicial proceedings of any court of any such state ... shall have the full faith and credit within the United States and its territories as they have by law or usage in the courts of such state ... from which they are taken.

■ Thus, a federal court is compelled to apply the claim and issue preclusion law of the forum state in which the prior judgment was rendered. *Migra v. Warren City School District Board of Education,* 465 U.S. 75, 81, 104 S.Ct. 892, 79 L.Ed.2d 56 (1984); *See also Middlesex County Board of Chosen Freeholders v. State of New Jersey Dept. of Environmental Protection,* 645 F.Supp. 715, 719 (D.N.J.1986); *Printing Mart–Morristown, Inc. v. Rosenthal,* 650 F.Supp. 1444, 1449 (D.N.J.1987). The preclusive effect of the state court judgment against T & E must therefore be determined by reference to the law of New Jersey.

New Jersey has adopted the "entire controversy doctrine", which sets forth a broad policy against claim splitting. New Jersey Court Rule 4:27–1(b). The doctrine, a near relative to the doctrine of *res judicata,* requires a party to assert all possible claims related to a single controversy in the same action or be barred from raising them in future actions. *Id.; Falcone v. Middlesex County Medical Society,* 47 N.J. 92, 219 A.2d 505 (1966). The Third Circuit in reviewing New Jersey's entire controversy doctrine has noted that it "reaches more broadly than the 'same cause of action' requirement of traditional *res judicata* doctrine" ... [and] ... is instead a "transaction-based" doctrine. *Printing Mart–Morristown, Inc., supra,* at 1447. Moreover, the entire controversy doctrine precludes subsequent litigation not only of those claims previously litigated, but of *all* claims arising out of the same controversy that could have been raised in the earlier action. *Id.,* citing *Melikian v. Corradetti,* 791 F.2d 274, 279 (3rd Cir.1986) (emphasis in original).

Although there seems to be no dispute that the present claim arises out of the same "series of transactions" that gave rise to plaintiff's state claim, this Court finds it significant that the entire controversy doctrine precludes subsequent litigation only of those claims which *could have been raised* in the earlier action. *See Ayers v. Jackson Township,* 106 N.J. 557, 583, 525 A.2d 287 (1987) (indicating doctrine inapplicable where claim could not have been joined); *See also Middlesex County Board of Chosen Freeholders v. N.J.,* 645 F.Supp. 715 (D.N.J.1986). Here, plaintiff clearly could not have raised its CERCLA claim in the Superior Court of New Jersey. 42 U.S.C. § 9613(b) provides in pertinent part:

... The United States district courts shall have exclusive jurisdiction over all controversies arising under this Chapter, without regard to the citizenship of the parties or the amount in controversy. Venue shall lie in any district in which the release or damages occurred, or in which the defendant resides, may be found, or has his principal office.

Despite this clear statement of exclusive jurisdiction over CERCLA claims to the United States District Courts, defendant contends that such should not operate to permit T & E to receive what might amount to a "second bite at the apple." Defendants first direct this Court's attention to *Marrese v. American Academy of Orthopedic Surgeons,* 470 U.S. 373, 105 S.Ct. 1327, 84 L.Ed.2d 274 (1985). In *Marrese,* the Court stated that the fact that a petitioner's claim was within the exclusive jurisdiction of the federal courts did not necessarily make 28 U.S.C. § 1738 inapplicable. The court noted that "our decisions indicate that a state court judgment may in some circumstances have preclusive effect in a subsequent action within the exclusive jurisdiction of the federal courts." To that end, the Court reviewed its analysis in *Kremer v. Chemical Construction Corp.,* 456 U.S. 461, 102 S.Ct. 1883, 72 L.Ed.2d 262 (1982).

■ *Kremer* indicated that while 28 U.S.C. § 1738 requires a federal court to look

first to state preclusion law in determining the preclusive effect of a state court judgment, even if the state law would bar relitigation,[5] an exception to § 1738 might be found. 456 U.S. at 468, 102 S.Ct. at 1890. However, an exception to § 1738 will not be recognized unless "a later statute contains an express or implied repeal." *Id.* While CERCLA does not expressly repeal § 1738, the statutory provisions and legislative history infer support for finding a partial implied repealer. *See,* 42 U.S.C. § 9612(e) (other statutory and common law claims do not bar claims under CERCLA); 42 U.S.C. § 9613(b); 1980 U.S.Code Cong. and Adm.News p. 6119.

Defendant urges this Court to follow the concurring opinion of Chief Justice Burger in *Marrese,* which suggested that even if state laws held there to be no preclusion due to the fact that state courts had no jurisdiction over the federal claim, if as a practical matter the state action provided remedies akin to the federal remedies sought, the "jurisdictional competency requirement is effectively satisfied." 470 U.S. at 388, 105 S.Ct. at 1336. This Court, however, takes direction from the majority opinion, specifically fn. 3 on page 383, 105 S.Ct. at page 1333, fn. 3, which in addressing the Chief Justice's concurring opinion noted that "although a particular state's preclusion principles conceivably could support a rule similar to that proposed by the Chief Justice, ... where state preclusion rules do not indicate that a claim is barred, we do not believe that federal courts should fashion a federal rule to preclude a claim that could not have been raised in the state proceedings."

Defendants also cite *Printing Mart–Morristown, Inc. v. Rosenthal,* 650 F.Supp. 1444 (D.N.J.1987) in support of their contention that the entire controversy doctrine precludes plaintiffs from maintaining this action. In that case, the court granted defendant's motion to dismiss plaintiff's complaint with great reluctance, finding that the claim was available to plaintiff at the time it instituted the state court action.

650 F.Supp. at 1445. The *Printing Mart* case is distinguishable from the present action for several reasons.

In *Printing Mart–Morristown v. Rosenthal, supra,* the defendants argued that the failure of plaintiff to raise its claim under the Racketeer Influenced and Corrupt Organizations Act (RICO), in the state court action barred prosecution of the subsequent claim in federal court. The district court agreed with defendant's argument for reasons which have no bearing on this action. First, the court noted that the issue of exclusive jurisdiction of the federal courts over RICO claims was not clear. 650 F.Supp. at 1449. Several district courts had concluded that the state courts had concurrent jurisdiction over federal RICO claims, yet the only New Jersey state court to have addressed the issue had rejected the notion of concurrent jurisdiction in favor of exclusive jurisdiction in the federal court. *Id.,* citing *Maplewood Bank & Trust Co. v. Acorn, Inc.,* 207 N.J.Super. 590, 504 A.2d 819 (Law Div.1985). The court therefore suggested that under the circumstances, and in light of more recent district court decisions which shed doubt on the reasoning behind the New Jersey state court's decision, plaintiff should have tested the jurisdiction issue in the state court. *Id.* In the present action, there was no need for plaintiff to test the jurisdiction issue. It is clear that under CERCLA the federal district courts have exclusive jurisdiction. 42 U.S.C. § 9613(b).

Second, the *Print Mart* court was persuaded by the fact that New Jersey had a "little RICO" statute analogous to the federal RICO statute, which plaintiffs had failed to assert a claim under. *Id.* at 1450. The court thus concluded that there had been a "conscious withholding" of the RICO claim in violation of the entire controversy doctrine. *Id.* Although this Court has considered the strong possibility of a "conscious withholding" of claims, it cannot be conclusively stated that such was

---

**5.** Again, it should be noted that New Jersey preclusion law would *not* bar relitigation, as the CERCLA claim "could not have been raised in the earlier action."

the case in this instance.[6]

■ Finally, defendants argument that the New Jersey Environmental Rights Act (ERA) and the Spill Compensation and Control Act ("Spill Act") provide remedies and relief essentially identical to CERCLA, is unpersuasive.[7] As this Court held in *Jersey City Redevelopment Authority v. PPG Industries*, 655 F.Supp. 1257, 1263 (D.N.J. 1987), the Spill Act reveals "no intent to provide for an individual to seek recovery of response costs against other private parties", nor does the language of such Act empower private entities to engage in actions for cleanup of hazardous substances. In addition, "although a private course of action under ERA may lie, ... pursuit of a private claim must await Departmental action." *Superior Air Products v. NL Industries*, 216 N.J.Super. 46, 61, 522 A.2d 1025 (App.Div.1987).[8] In contrast, CERCLA provides that a private cost recovery action may be commenced at any time after such costs have been incurred. 42 U.S.C. § 9613(g)(2). Finally, it would appear that § 114(c) of CERCLA pre-empts any remedy defendant alleges may exist under the Spill Act. *Exxon Corp. v. Hunt*, 475 U.S. 355, 106 S.Ct. 1103, 89 L.Ed.2d 364 (1986).

Thus, this Court finds defendants' argument that plaintiff's complaint should be dismissed as violative of New Jersey's "entire controversy doctrine" to be without merit and plaintiff's complaint will not be dismissed on that basis. It should be noted, however, that as the litigation in this action proceeds, this Court will be mindful of the doctrines of res judicata and collateral estoppel as they apply to specific issues under CERCLA which may have already been litigated in the state court. Relitigation of any such issues will not be permitted.

### 2. *Statute of Limitations.*

Defendant's original moving papers assert that plaintiff's claim for recovery of response costs under CERCLA is barred by the applicable statute of limitations.[9] The parties agree that 42 U.S.C. § 9613(g)(2) sets forth the statute of limitations under CERCLA as follows:

An initial action for recovery of the costs referred to in Section 9607 of this title must be commenced—(A) for a removal action, within 3 years after completion of the removal action, except that such cost recovery action must be brought within 6 years after a determination to grant a waiver under section 9604(c)(1)(C) for continued response action; and

(B) for a remedial action, within 6 years after initiation of physical on-site construction of the remedial action, except that, if the remedial action is initiated within 3 years after the completion of the

---

6. Defendants' reliance on *Smith Land & Improvement Corp v. Rapid–American Corp.*, Civil Action No. 86–6116 (M.D.Pa. Sept. 21, 1987), is similarly flawed. There the court found the doctrine of caveat emptor, available under the common law of Pennsylvania, to be the rule when determining plaintiff's right to recover its clean-up costs from the defendant. T & E's complaint in the present action, however, involves no state common law claims. In addition, the *Smith Land* court was clearly persuaded by the evidence that plaintiff *knew* of the "obvious" environmental condition of the property before purchasing it. No such evidence has been presented here.

7. It should be noted that in arguments before the state court, Safety Light specifically suggested that T & E's remedy was properly found in § 107(e)(2) of CERCLA.

8. Contrary to defendant's assertion, *Superior Air* does not create a private right of recovery of damages or response costs under the Spill Act. Rather, it provides that a private entity has standing to "enforce, or to restrain the violation of, any statute, regulation or ordinance designed to prevent or minimize pollution...." Moreover, while the Spill Act specifically entitles a private party to maintain an action for declaratory or equitable relief against another party, it is tellingly silent as to recovery of damages or response costs. N.J.S.A. 2A:35A–4(b).

9. Defendant's reply brief submitted in support of their motion and in opposition to plaintiff's cross-motion in no way addresses plaintiff's contrary assertions to this argument. Furthermore, this Court is somewhat confused as to whether or not defendants still contend the statute of limitations bars plaintiff's complaint. In defendants reply brief, it is suggested that Point II, dealing with recovery of response costs under CERCLA be substituted for Point II, Db 35–39 of the original brief. Yet, Db 35–39 of the original brief refers to Point III, which concerns itself with the statute of limitations argument.

removal action, costs incurred in the removal action may be recovered in the cost recovery action brought under this subparagraph.

Moreover, both sides categorize the actions for which costs are being sought as "removal" in nature. Thus, an action for recovery of such costs must be commenced "within 3 years after completion of the removal action...." 42 U.S.C. § 9613(g)(2)(A).

The parties, however, disagree as to the meaning of the phrase, "after completion of the removal action." Defendants contend that such applies to the completion of *each* removal action or effort undertaken. Plaintiff argues that the statute of limitations does not begin to run until the *entire* removal action is completed. This Court need not decide this debate for purposes of this motion.

As plaintiff points out, prior to the enactment of the Superfund Amendments and Reauthorization Act of 1986 (SARA), Pub.L. No. 99–499, § 113(c)(2), 42 U.S.C. § 9613(h), on October 17, 1986, there was no statute of limitations applicable to private cost recovery actions under CERCLA. *See, United States v. Bliss*, 14 Chem. Waste Lit. Reptr. 551, 553 (E.D.Mo.1987). Where, as here, a statute creates a period of limitations where none had previously existed, the period will begin to run with respect to preexisting claims on the effective date of the statute. *Superior Engraving Co. v. National Labor Relations Board*, 183 F.2d 783, 789 (7th Cir.1950) (citing among other decisions, *U.S. v. Morena*, 245 U.S. 392, 38 S.Ct. 151, 62 L.Ed. 359 (1918)), *cert. denied* 340 U.S. 930, 71 S.Ct. 490, 95 L.Ed. 671, (1951). The United States Supreme Court adopted the rule "to give the statute a construction that will enable it to stand", since it was thought that "to construe a limitation statute as absolutely barring all actions which had occurred more than the limited time before the statute was passed would render it unconstitutional." *Superior Engraving*, 183 F.2d at 789–90, *quoting Sohn v. Waterson*, 84 U.S. (17 Wall) 596, 599, 21 L.Ed. 737 (1873). As the United States Court of

Appeals for the Third Circuit has observed, "[t]he century-old *Sohn* rule still enjoys great viability." *Reuther v. Trustees of the Trucking Employees of Passaic and Bergen County Welfare Fund*, 575 F.2d 1074, 1078 n. 4 (3rd Cir.1978).

The statute of limitations for recovery of costs pursuant to CERCLA, as imposed by SARA, became effective on October 17, 1986. No time was given for filing claims that would otherwise be precluded by the new limitations period. Thus, T & E's CERCLA action, commenced within six months of the enactment of SARA, cannot be barred under our Constitution and plaintiff's complaint will not be dismissed on this ground.

### 3. *Mandatory Injunction*

Defendants argue that T & E's claim for a mandatory injunction to compel defendants to comply with their obligations under CERCLA should be dismissed as "the Act is totally devoid of any mention of any private cause of action for injunctive relief". *Cadillac Fairview/California, Inc. v. Dow Chemical Co.*, 21 ERC 1108, 1115 (C.D.Ca.1984). Specifically, defendants point to § 9606(a) which empowers the President of the United States through the United States Attorney General, in certain limited and exigent circumstances to seek injunctive relief, as an indication that Congress intended to limit such remedies to government-brought action. To a limited extent, this Court agrees.

The language authorizing private causes of action under CERCLA can be found in § 9607(a)(2)(B). There, the statute expressly sets forth the type of relief available in a private cause of action as "any other necessary costs of response ... consistent with the National Contingency Plan". 42 ERC at 1116; *Cf. Lieb v. American Motors Corp.*, 538 F.Supp. 127, 134 (S.D.N.Y.1982). Thus, to the extent defendants argue that CERCLA does not provide a private party with the right to injunctive relief requiring cleanup of a hazardous waste site, this Court agrees.

However, the federal courts do not need statutory authorization to grant injunctive relief. The courts derive their authority to issue injunctions from their inherent power to fashion appropriate remedies in civil suits over which they have jurisdiction and "absent the clearest command to the contrary from Congress, federal courts retain their equitable power to issue injunctions in suits over which they have jurisdiction". *Califano v. Yamasaki*, 442 U.S. 682, 705, 99 S.Ct. 2545, 2559, 61 L.Ed.2d 176 (1985); *See also Mitchell v. Robert DeMario Jewelry, Inc.*, 361 U.S. 288, 80 S.Ct. 332, 4 L.Ed.2d 323 (1960) ("absent express limitations a statute will not be interpreted to narrow the full scope of equitable remedies, including injunctions"); *Denicola v. G.C. Murphy Co.*, 562 F.2d 889, 894 (3rd Cir.1977). In no section of the statute does there appear to be a prohibition against injunctive relief to private litigants.

Therefore, while this Court acknowledges the fact that CERCLA does not provide private litigants with a cause of action by which they may require others to clean up hazardous sites, it nevertheless does not prohibit other forms of injunctive relief to private litigants. Other forms of injunctive relief could be granted to compel defendants to "comply with their obligations," which may be limited to simply reimbursing plaintiff for "necessary costs." Thus, plaintiff's claim for injunctive relief will not be dismissed at this time.

4. *Response Costs/Summary Judgment*

Finally, defendants assert that plaintiff's claim for alleged response costs should be dismissed as such do not fall under the statute's definition of "remedial" or "removal" costs, nor were they incurred consistent with the National Contingency Plan. Plaintiff, on the other hand, moves for partial summary judgment declaring Safety Light liable under CERCLA and awarding T & E recovery of "response costs" already incurred.

CERCLA provides that a private party may commence a cost recovery action against another private entity for "necessary costs of response incurred ... consistent with the national contingency plan". 42 U.S.C. § 9607(a)(4)(B). The statute does not expressly define "necessary costs of response", but does provide that "response" means "remove, removal, remedy and remedial action ... includ[ing] enforcement activities related thereto". 42 U.S.C. § 9601(25). "Remove" and "removal" are defined as:

The cleanup or removal of released hazardous substances from the environment, such actions as may be necessary taken in the event of the threat of release of hazardous substances into the environment, such actions as may be necessary to monitor, assess, and evaluate the release or threat of release of hazardous substances, the disposal of removed material, or the taking of such other actions as may be necessary to prevent, minimize, or mitigate damage to the public health or welfare or to the environment, which may otherwise result from a release or threat of the release. The term includes in addition, without being limited to, security fencing or other measures to limit access, provision of alternative water supplies, temporary evacuation and housing of threatened individuals not otherwise provided for, action taken under section 104(b) of this Act, and any emergency assistance which may be provided under the Disaster Relief Act of 1974.

42 U.S.C. § 9601(23). "Remedy" and "remedial action" are defined as meaning:

[T]hose actions consistent with permanent remedy taken instead of or in addition to removal actions in the event of a release or threatened release of a hazardous substance into the environment, to prevent or minimize the release of hazardous substances so that they do not migrate to cause substantial danger to present or future public health or welfare or to the environment. The term includes, but is not limited to, such actions at the location of the release as storage, confinement, perimeter protection using dikes, trenches, or ditches, clay cover, neutralization, cleanup of re-

leased hazardous substances or contaminated materials, recycling or reuse, diversion, destruction, segregation of reactive wastes, dredging or excavations, repair or replacement of leaking containers, collection of leachate and runoff, on-site treatment or incineration, provision of alternative water supplies, and any monitoring reasonably required to assure that such actions protect the public health and welfare and the environment. The term includes the costs of permanent relocation of residents and businesses and community facilities where the President determines that, alone or in combination with other measures, such relocation is more cost effective than and environmentally preferable to the transportation, storage, treatment, destruction, or secure disposition offsite of hazardous substances and associated contaminated materials.

42 U.S.C. § 9601(24). It has been established that "removal" actions are primarily those intended for short-term or interim responses and "remedial" actions are generally considered long-term or permanent remedies. *City of New York v. Exxon Corp.*, 633 F.Supp. 609, 614 (S.D.N.Y.1986).

In its Complaint, T & E alleges that it has incurred the following response costs:

(a) retaining experts and purchasing specialized equipment to monitor and evaluate U.S. Radium's pollution,

(b) modifying the facilities located on the Alden Street property, educating T & E's employees and taking other measures to prevent, minimize and mitigate the damages to the public welfare,

(c) evacuating the Alden Street property and relocating the business operations, and

(e) [10] enforcing U.S. Radium's and its successors' obligations under CERCLA.

Defendants primarily object to three (3) expenses allegedly incurred by plaintiff in response to the "radiation problem". Those expenses may be classified as (1) time spent by T & E's President, Mr. Leonard Box, in response to the problem; (2) the evacuation from the Alden Street property

and the move and modification of the new facilities occupied by T & E and; (3) attorneys' fees and costs of litigation in regard to this action. For purposes of determining whether any of these expenses fall within CERCLA's definition of "necessary costs of response", each will be separately addressed.

(1) *Time Spent by T & E's President*

Section 9601(23) specifically includes in its definition of "removal" action, "such actions as may be necessary to monitor, assess and evaluate the release or threat of release of hazardous substances ... [and] such other actions as may be necessary to prevent, minimize or mitigate damage...." Defendants do not address their arguments on their motion to dismiss to each cost alleged within this section, but, rather, strenuously object to the inclusion of costs attributable to the time spent by Mr. Leonard Box, T & E's President, on the radiation situation. Defendants contend that plaintiff's claim for $298,600 for the value of time spent by Mr. Box in "response" to the problem is vague and speculative. Further, defendants assert that T & E's claim for recovery of time that its President could not spend on business operations due to the radiation situation amounts to an attempt to recoup "business losses", which are clearly not recoverable under CERCLA. *See, Artesian Water Co. v. Government of New Castles Cty.*, 659 F.Supp. 1269 (D.Del. 1987).

Plaintiff argues that the fact that much of the time spent assessing and dealing with the radiation problem was undertaken by Box does not negate the labor's costs nor disqualify it as a response cost. Moreover, plaintiff urges this Court to recognize the costs recoverable by non-governmental entities and governmental entities as the same.

At least one other district court has held that labor costs incurred in enforcing the provisions of CERCLA are recoverable as response costs. *United States v. NEPAC-CO*, 579 F.Supp. 823 (W.D.Mo.1984). While

---

**10.** There is no subsection (d) in plaintiff's complaint.

it is true that in *NEPACCO* the party seeking to recover such costs was the United States government and the labor costs were incurred by the staffs of the EPA and the Department of Justice, this Court finds no support for defendants' contention that a distinction between the costs recoverable by the government and those costs recoverable by private parties should be made.

▬ Section 9607(a)(4)(A) entitles the government to recover "all costs of removal or remedial action incurred...." Similarly, § 9607(a)(4)(B) provides that a private party may recover "any other necessary costs of response incurred ..." As noted above, "response" has been defined as "remove, removal, remedy and remedial action...." 42 U.S.C. § 9601(25). Accordingly, CERCLA on its face, entitles a private entity to recover the same type of costs that the government is entitled to recover.[11]

Plaintiff has alleged that Box was personally involved in several aspects of monitoring, evaluating, and minimizing the radiation problem. Whether plaintiff can set forth sufficient facts to meet its burden at a later date remains open, however, for now it appears that it cannot be said that no set of facts could be proven in support of plaintiff's claim. Dismissal of such is, therefore, at this time inappropriate.

### (2) *Evacuation and Relocation*

▬ Defendants seek to dismiss plaintiff's claim for alleged response costs incurred in vacating the Alden Street property and relocating to a new facility. Plaintiff argues that such was necessary due to the threat of releases of hazardous substances.

Section 9601(23) provides that temporary evacuation and housing of threatened individuals may be included within the term "removal". In addition, § 9601(24) pro-

vides that the term "remedial" includes the costs of "permanent relocation of residents and businesses and community facilities *where the President determines* that, alone or in combination with other measures, such relocation is more cost-effective than and environmentally preferable...." (emphasis added). While plaintiff may be able to prove some set of facts which may entitle it to recovery of costs incurred in evacuating the premises, this Court finds that plaintiff can prove no set of facts which would entitle it to recovery of those costs incurred in relocating its business. The action taken by T & E in relocating its facilities are clearly permanent in nature and thus were required to comport with the requirements set forth in § 9601(24).[12] In particular, the costs incurred in a permanent relocation of a business must be approved by the President to be categorized as reimburseable response costs. Thus, plaintiff's allegations for recovery of costs incurred in locating and establishing a new facility are stricken.

### (3) *Attorney Fees and Costs in Connection with this Litigation*

▬ Defendants argue that T & E cannot recover any attorney fees incurred in the prosecution of this action. This Court recognizes that it is well-established that a party cannot recover attorney fees unless provided for by contract or statute. *Alyeska Pipeline Co. v. Wilderness Society*, 421 U.S. 240, 262, 95 S.Ct. 1612, 1624, 44 L.Ed. 2d 141 (1975). Upon careful review of the CERCLA statute, this Court finds no indication that attorney fees and costs of litigation are recoverable by a private litigant. While this Court found above that there was no evidence of a general intent to distinguish between costs recoverable by governmental and non-governmental entities, this particular cost has been dealt with specifically in a section dealing with gov-

---

**11.** The fact that plaintiff may be held to a different standard than the government in proving the "consistency" of such action with the national contingency plan does not affect defendants' motion to dismiss, but rather, will be considered in regard to plaintiff's motion for summary judgment.

**12.** T & E incurred almost a million dollars worth of expenses in relocating its business, including approximately $340,115.00 for modifying and repairing the new facility in order that T & E would be able to continue its operations in the future from such site.

ernmental action. *See* § 9604(b). Such section was found to provide for the recovery of attorney fees and litigation costs by the *government* in *United States v. NEP-ACCO, supra,* 579 F.Supp. at 851, in that it expressly states that "... the *President* ... may undertake such planning, *legal,* fiscal, economic, engineering, architectural, and other studies or investigations as he may deem necessary ... to plan and direct response actions, to recover the costs thereof, and to enforce the provisions of this chapter". 42 U.S.C. § 9604(b) (emphasis added). This Court can find no analogous portion of the statute which would entitle a private party to recover for legal action taken and refuses to create a right to recovery of attorney fees where Congress has not expressly stated such to exist.[13] Therefore, allegations in plaintiff's Complaint concerning litigation costs and attorney fees are stricken.

### 5. *Plaintiff's Motion for Summary Judgment*

Plaintiff cross-moves before the Court for a grant of partial summary judgment declaring Safety Light liable for all necessary costs of response incurred and to be incurred by T & E consistent with the National Contingency Plan. In addition, plaintiff seeks an award of response costs already incurred. Defendants argue as they did on their motion to dismiss that certain costs sought by plaintiff are not recoverable response costs under CERCLA and further, that such costs were not incurred consistent with the National Contingency Plan.

In order to prevail on a motion for summary judgment, the moving party must show that "no genuine issue of material fact exists and that [it] is entitled to a judgment as a matter of law". Fed.R.

Civ.P. 56(c). As to plaintiff's motion for a declaratory judgment, plaintiff is required to establish the following facts:

(1) the Alden Street property is a "facility",

(2) a "release" or a "threatened release" of a hazardous substance from the Alden Street property has occurred, and

(3) the release or threatened release has caused plaintiff to incur "response costs", and

(4) defendant fits within the definition of a covered person within § 9607(a).

*See, United States v. Conservation Chemical Co.,* 619 F.Supp. 162, 184 (D.C.Mo. 1985). If undisputed facts establish each of these elements, plaintiff is entitled to summary judgment declaring Safety Light liable.

■■■ Unquestionably, the Alden Street property is a facility within the statute. § 9601(9). "Facility" is broadly defined and includes almost every place a hazardous substance could find its way into. *New York v. General Electric Co.,* 592 F.Supp. 291, 296 (N.D.N.Y.1984).

■■■ Although the parties debate the issue of whether a "hazardous substance" has been released or threatened to release, this debate will not preclude summary judgment from being awarded. Defendants claim the substances which allegedly give rise to this claim, *i.e.,* the carnotite ore tailings, are excluded from regulation as "hazardous substance" under CERCLA. Specifically, defendants assert what has commonly been referred to as the "mining waste exclusion".[14] However, as defendants recognize, most courts faced with this dilemna have found the mining waste exclusion to apply only to § 9601(14)(C). *Eagle–Picher Industries, Inc. v. EPA,* 759 F.2d 922, 927 (9th Cir.1985); *United States*

---

**13.** Plaintiff's argument that because response costs include "enforcement activities related thereto" they should be entitled to attorney fees is without merit. While, plaintiffs may bring an action for recovery of response costs, they may not bring an action to enforce CERCLA's cleanup provisions against another private entity. Thus, private parties do not incur "enforcement costs" as contemplated by CERCLA.

**14.** Section 9601(14)(C) specifically excludes any waste, the regulation of which under the Solid Waste Disposal Act has been suspended by Act of Congress. In § 3001(b)(3)(A)(ii) of the Solid Waste Disposal Act, Congress expressly concluded "solid waste from the extraction, benefication and processing of ores and minerals, ..." from regulation pending EPA study. This is often referred to as the "mining exclusion".

*v. Union Gas Co.*, 586 F.Supp. 1522, 1523–24 (E.D.Pa.1984). Thus, defendants' argument is unpersuasive. Moreover, as plaintiff points out, radionuclides, such as radium and radon, have been designated as "hazardous substances" under CERCLA. 42 U.S.C. § 9601(14)(B), (E).

The debate between the parties as to how much of the costs incurred by T & E were "necessary", likewise does not preclude the granting of a declaratory judgment at this time. While the determination of whether such costs were "necessary" and "consistent with the National Contingency Plan" does preclude this Court from entering summary judgment as to specific amounts of the costs, the question of amount can be dealt with at a later time.[15] For now, it is clear that certain items which T & E seeks to recover are included within the meaning of response costs under CERCLA.

Finally, Safety Light has admitted that it is the corporate successor of U.S. Radium, a corporation which clearly fits within the definition of responsible parties under CERCLA.

Based upon the above conclusions, this Court finds that plaintiff is entitled to a declaratory judgment holding Safety Light liable for any necessary costs of response incurred and to be incurred by T & E, consistent with the National Contingency Plan. T & E's request that summary judgment be granted for an award of response costs already incurred is, however, denied at this time, as questions of fact remain concerning the necessity of such costs and their consistency with the National Contingency Plan.

## CONCLUSION

Defendants' motion to dismiss plaintiff's claim based upon the entire controversy doctrine and the statute of limitations is denied. Defendants' motion to dismiss plaintiff's claim for a mandatory injunction is denied. Defendants' motion to dismiss

certain response costs is granted in part; specifically as to plaintiff's allegations concerning attorney fees and costs of litigation and the relocation of T & E's business.

Plaintiff's cross-motion for partial summary judgment declaring Safety Light liable under CERCLA is granted; however, the entry of an award for recovery of response costs already incurred is inappropriate for summary judgment at this time.

An Order in conformity with this Opinion shall be submitted by defendants.

---

15. This Court disagrees with defendants' assertion that a declaratory judgment for plaintiff is tantamount to writing a "blank check". Plaintiff will still be required to prove that such costs are "necessary" and "consistent with the National Contingency Plan" and, thus, a limitation does exist on the costs incurred and recovered.