**AMLAND PROPERTIES CORP., Plaintiff,**

v.

**ALUMINUM COMPANY OF AMERICA, Defendant/Third Party Plaintiff,**

v.

**TRI–TERMINAL CORP., Edith Maidman as Executrix of the Estate of Irving Maidman; Donald Steinberg, as Executor of the Estate of Irving Maidman; 700 River Road Realty, Inc.; Edgewater Associates; Does 1 through 10; Citibank, N.A., Third Party Defendants.**

**Civ. A. No. 86–1830.**

United States District Court, D. New Jersey.

April 18, 1989.

Robinson, Wayne & La Sala, P.A. by
Robert A. Wayne, Newark, N.J., and Mor-
gan, Lewis & Bockius, P.A. by John
Quarles, Washington, D.C., for plaintiff
Amland Properties Corp.

LeBoeuf, Lamb, Leiby & MacRae, P.A. by Frederick B. Lacey, Newark, N.J., and LeBoeuf, Lamb, Leiby & MacRae, P.A. by Grant S. Lewis, New York City, for defendant Aluminum Co. of America.

OPINION

BARRY, District Judge.

## I. INTRODUCTION

As may be expected when motions and cross-motions for summary judgment are supported by eight briefs, totalling some 350 pages, and over 300 separate exhibits, totalling thousands of pages, very little is agreed upon by the parties. They do agree that defendant Aluminum Company of America (hereinafter "Alcoa") constructed and operated an industrial manufacturing plant in Edgewater, New Jersey (hereinafter "Edgewater plant") from 1914 through 1965. They agree, as well, that between 1956 and 1965, Alcoa made use of at least two fire-resistant hydraulic fluids containing polychlorinated biphenyls, or PCBs. These hydraulic fluids, Pydraul F–9 (assertedly composed of over 50% PCBs) and Pydraul 600, were used in at least fourteen of the 120 hydraulic systems that operated in the Edgewater plant. At least two machines—a Dempster baler and a vertical impact extrusion press—utilized Pydraul F–9, and an indeterminate number of electrical transformers in the Edgewater plant were contaminated with PCBs. The parties also agree that in 1968 Alcoa sold the Edgewater plant, "as is," to Irving Maidman (who thereupon assigned his rights to Tri–Terminal Corporation), and that in 1983 (after two intervening owners), plaintiff Amland Properties Corporation (hereinafter "Amland") acquired title to the property pursuant to an "as is" purchase agreement with Citibank.

The condition of the property at the time of the 1968 sale is in considerable dispute. Alcoa maintains that it removed most of the manufacturing equipment (except for 45 transformers) from the Edgewater plant, that the plant was free of debris and had been swept clean, and that the buildings were weather-tight. See Deft's Brief in Opposition to Plaintiff's Motion for Partial Summary Judgment (hereinafter "Deft's CERCLA Opposition Br.") at 7–8; Anderson Aff., ¶¶ 7–10 and Exhs. 1–13. Amland contends that, at the time of the 1968 sale, "many ovens, furnaces, tanks, machines, [and] pumps" remained, and that "areas of the Edgewater plant floors were stained with oil and fluids."[1] See Plff's Reply Brief in Support of Motion for Partial Summary Judgment (hereinafter "Plff's CERCLA Reply Br.") at 18–19; Plff's Supp.App., Tab 4. The parties also disagree as to the activities conducted at the plant by Tri–Terminal Corporation and its lessees, and particularly disagree as to whether those activities may have involved use of PCBs, compare Plff's CERCLA Reply Br. at 19 with Deft's CERCLA Opposition Br. at 8–10; discovery as to these issues has apparently has not been completed. Id. at 8. Furthermore, although it is clear that, even in 1968, Alcoa had knowledge that PCB use presented some amount of risk, see Deft's Reply Brief in Support of Summary Judgment Motion on Plaintiff's Common Law Claims (hereinafter "Deft's Common Law Reply Br.") at .43–44; Deft's Supp.App., Tabs 9–10, the extent of that knowledge remains undetermined, and further discovery in this area is necessary as well. See Plff's Brief in Support of Cross–Motion for Summary Judgment on Strict Liability Claim (hereinafter "Plff's Strict Liability Br.") at 62 and n. 68.

Prior to its purchase of the Edgewater plant, Amland inspected the property. In 1981, a laboratory retained by Amland advised that testing for organics (such as PCBs) and inorganics be conducted, a suggestion Amland chose to decline. Although Alcoa contends that the suggested testing would have revealed any presence of PCBs, it does not appear to argue that

---

1. Alcoa contends that oily stains were not present on the floors of the Edgewater plant at the time of the 1968 sale. See Anderson Aff., ¶ 11. The photographs attached to the Anderson affidavit are said by Alcoa to evidence that fact. Amland, by way of the Short Aff., ¶¶ 8–9, takes a different view of these photographs.

Amland in fact was aware of the PCB contamination at the time of its 1983 purchase of the Edgewater plant. *See* Deft's CERCLA Opposition Br. at 15 and n. 15; 17 n. 18. The date of Amland's discovery of PCBs at the plant was April 1985, a result of testing performed by the engineering firm of Paulus, Sokolowski & Sartor. *See* Plff's CERCLA Reply Br. at 22; Plff's App., Tab 9.

In June 1985, Amland notified Alcoa, the municipality of Edgewater, the New Jersey Department of Environmental Protection (hereinafter "DEP"), and the United States Environmental Protection Agency (hereinafter "EPA") of the presence of PCBs at the Edgewater plant. That same month, Amland contends, it was notified by DEP that it (and Alcoa) were parties responsible for that contamination, and that DEP would, if need be, commence an enforcement action mandating that Amland clean up the PCBs. *See* Plff's CERCLA Reply Br. at 23; Brecher Aff., ¶ 8. A draft administrative consent order ("ACO"), proposed in July 1985, called for a cleanup standard of no detectable PCBs at surface levels and up to 5 parts per million ("ppm") of PCBs below surface. *See* Plff's Supp. App., Tab 35 at 16. The final ACO, signed on August 21, 1986, contained a surface level standard of 1 ppm, and the same below-surface standard. *Id.*, Tab 4, ¶ 13.[2] Whereas Amland portrays the DEP action as the imposition of a cleanup standard upon Amland, *see* Plff's CERCLA Reply Br. at 24–25, Alcoa maintains that DEP advised Amland that the condition of the Edgewater plant was not severe enough to warrant coverage by the Superfund, and that Amland (at DEP's suggestion) signed the ACO as "the fastest route for getting state approvals" for its planned transformation of the Edgewater site into residential condominiums. Deft's CERCLA Opposition Br. at 20–21, and 21 n. 23; Deft's App., Tab 75.

The cleanup of the Edgewater plant included, according to Amland, initial consideration of various remedial measures, such as the use of solvents and microwaves, and encapsulation (covering) of affected surfaces. *See* Plff's CERCLA Reply Br. at 27; Brecher Aff., ¶¶ 10, 16. The actual cleanup undertaken by Amland is said to have included "scarifying (removing the surfaces of) concrete flooring, removing concrete slabs, removing contaminated wood block flooring, and decontaminating non-porous surfaces (walls, pipes, roofs, trusses, etc.)." Plff's CERCLA Reply Br. at 27; *see* Plff's Supp.App., Tab 43. In addition, the cleanup procedure called for the decontamination of debris to a level of 50 ppm PCBs or lower, so that the decontaminated debris could be disposed of at a general municipal landfill, rather than at a hazardous waste landfill. *See* Brecher Aff., ¶ 17; Deft's Reply Brief in Support of Summary Judgment Motion on Plff's CERCLA Claims (hereinafter "Deft's CERCLA Reply Br.") at 29 n. 36. It appears, however, that PCB contamination has "migrated" deeper into certain concrete flooring than had been previously detected, *see* Plff's CERCLA Reply Br. at 28, requiring that Amland petition DEP for a revised cleanup procedure. *See* Brecher Aff., ¶ 11.

Amland has conducted numerous tests for the presence of PCBs in the land and ambient air surrounding the Edgewater plant. Tests performed at a school located across from the plant's northern front proved negative, as have all other tests performed outside the plant's property. *See* Deft's App., Tabs 68–69; Deft's CERCLA Opp. Br. at 18 n. 19. The only—or at least the primary—exterior PCB contamination pointed to by Amland is the presence of PCBs in the asphalt of the Edgewater plant's parking area. *See* Plff's CERCLA Reply Br. at 47 n. 136; Plff's App., Tab 9 at 1. This contaminated area, directly adjacent to the Edgewater plant's loading docks, shows PCB levels of 2 to 47

---

**2.** Alcoa maintains that the proposed ACO of October 1985, Deft's Supp.App., Tab 5, and the final ACO of August 1986 contain identical cleanup levels. *See* Deft's CERCLA Reply Br. at 22 n. 30. The proposed ACO of August 1985, however, states that "[s]urface areas and residues with any detectable levels of PCBs ... shall be considered contaminated and shall be decontaminated in accordance with the cleanup plan and this paragraph." Plff's Supp.App., Tab 35.

ppm. Perhaps because this contamination is less than 50 ppm, which is the minimum level of PCB contamination that would constitute a spill under EPA's Spill Cleanup Policy, *see* 52 Fed.Reg. 10,688 (1987), Amland has not yet acted to remedy the contaminated area. *See* Deft's Supp.App., Tab 6.

Amland commenced the instant lawsuit against Alcoa in April 1986 and seeks recovery of the costs it has incurred in evaluating and responding to the PCB contamination at the Edgewater plant. Jurisdiction in this Court is predicated upon the claim asserted under the Comprehensive Environmental Response, Compensation and Liability Act ("CERCLA"), 42 U.S.C. § 9601 *et seq.*, for the recovery of past and future response costs. In addition, the complaint asserts four common law tort claims: strict liability, private nuisance, public nuisance, and negligence.

Amland moved, in early 1988, for partial summary judgment, requesting a declaration that Alcoa was and will be liable to Amland for the latter's response costs.[3] Alcoa thereupon cross-moved for summary judgment as to Amland's CERCLA and common law claims. In response, Amland cross-moved for summary judgment as to its strict liability claim.

For the reasons that follow, I grant Alcoa's motions as to Amland's CERCLA claim, excluding monitoring and evaluation costs since April 1985, and as to Amland's private nuisance, public nuisance, and negligence claims. Both parties' summary judgment motions as to Amland's strict liability claim will be denied, in that at this juncture factual issues preclude a definitive application of the Restatement (Second) of Torts' factors regarding abnormally dangerous activities.

## II. DISCUSSION

### A. CERCLA

CERCLA was enacted in 1980, in the waning months of the 96th Congress, and its "precipitous passage" perhaps explains the "inartful drafting and numerous ambiguities" that characterize its provisions. *Artesian Water Co. v. Gov't of New Castle County*, 851 F.2d 643, 648 (3d Cir.1988). The act attempts to provide for responses, both short-term and long-term, to the presence of hazardous wastes that threaten to or have already contaminated the environment. In addition, responses both by federal and state governments and by private parties are included within CERCLA's ambit. As to both short-term and long-term responses, and both governmental and private cleanups, the overarching goal of CERCLA is to place the financial cost of the cleanup upon those parties responsible for creating the hazardous condition. *See Lone Pine Steering Committee v. EPA*, 777 F.2d 882, 886 (3d Cir.1985); *Artesian Water Co. v. Gov't of New Castle County*, 659 F.Supp. 1269, 1276 (D.Del. 1987), *aff'd* 851 F.2d 643 (3rd Cir.1988).

The section under which Amland seeks recovery states as follows, in relevant part:

Notwithstanding any other provision or rule of law, and subject only to the defenses set forth in subsection (b) of this section—

. . . .

(2) any person who at the time of disposal of any hazardous substance owned or operated any facility at which such hazardous substances were disposed of,

. . . .

shall be liable for

. . . .

(B) any other necessary costs of response incurred by any other person [i.e., any person or entity other than the federal or state government] consistent with the national contingency plan[.]

42 U.S.C. § 9607(a)(2)(B). In order to impose liability under this section, Amland must plead and prove the following five elements:

---

3. Although Amland does not seek entry of a specific dollar figure reflecting response costs, it appears that Amland places a $25 million tab on "the cost of any actions taken ... in response to hazardous wastes" at the Edgewater plant. Del Bene Dep. 164:16–165:5 (attached at Deft's App., Tab 92).

(1) Alcoa falls within one of the four categories of "covered persons," 42 U.S.C. § 9607(a)(1)–(4);[4]

(2) There was a release or threatened release of a hazardous substance resulting from the disposal of that substance;

(3) The release or threatened release caused Amland to incur response costs;

(4) Amland's costs were necessary costs of response; and

(5) Amland's response was consistent with the national contingency plan ("NCP").[5]

*See Artesian*, 659 F.Supp. at 1278; *Ascon Properties, Inc. v. Mobil Oil Co.*, 866 F.2d 1149, 1152–1153 (9th Cir.1989). Absent the demonstrated presence of an affirmative defense—that the release was due *solely* to an act of God or of war, or an act or omission of a third-party unrelated to the defendant, *see* 42 U.S.C. § 9607(b)(1)–(3)—the above provisions of CERCLA, if proven, serve to impose strict liability upon the offending party. *See New York v. Shore Realty Corp.*, 759 F.2d 1032, 1042 (2d Cir.1985); *United States v. Price*, 577 F.Supp. 1103, 1113–14 (D.N.J. 1983).

Alcoa raises a number of arguments in support of its contention that Amland may not recover under CERCLA. First, Alcoa makes a somewhat half-hearted argument that CERCLA should not be applied retroactively (i.e., to conduct occurring prior to the passage of CERCLA in 1980) in an action between private parties. It further contends that its actions did not constitute a disposal of hazardous waste, and that no release or threatened release is demonstrated. Finally, Alcoa maintains that Amland is barred from CERCLA recovery because the costs incurred by Amland were not consistent with the NCP. As will be discussed below, I reject the first three contentions, but am persuaded that the vast majority of Amland's response costs were not consistent with the NCP and, thus, are not recoverable under CERCLA.

**1. *Retroactive Application of CERCLA***

■ Alcoa raises its retroactivity argument in two pages of its initial brief, *see* Deft's Brief in Support of Cross–Motion for Summary Judgment (hereinafter "Deft's Cross Motion Br.") at 18–20. Following Amland's rebuttal, *see* Plff's Strict Liability Br. at 32–37, Alcoa's retroactivity argument was relegated to a footnote. *See* Deft's CERCLA Reply Br. at 2 n. 4. Alcoa's succinct argument commences with the statement that the Court of Appeals for the Third Circuit has recognized that a "serious question exists" as to the application of CERCLA, in private party response actions, to conduct which took place before the 1980 enactment of that statute. *See* Deft's Cross Motion Br., at 18. The case cited, *Smith Land & Improvement Corp. v. Celotex Corp.*, 851 F.2d 86 (3d Cir.1988), in fact said no such thing, but only noted that the retroactivity issue had been neither briefed nor raised and, thus, should be decided in the first instance by the lower court. *Id.* at 92. Alcoa also asserts that the *Smith Land* court "notes authorities which reach both results" on this question, *see* Deft's Cross Motion Br. at 18; in fact, every authority cited in *Smith Land* holds that CERCLA may be applied retroactively, *see United States v. Northeastern Pharmaceutical & Chemical Co.* (hereinafter *NEPACCO*) 810 F.2d 726, 732–34 (8th Cir. 1987); *Mayor of Boonton v. Drew Chemical Co.*, 621 F.Supp. 663, 668 (D.N.J.1985); that the 1986 amendments to CERCLA may be applied retroactively, *see United States v. Rohm & Haas Co.*, 669 F.Supp. 672, 676–77 (D.N.J.1987); or that the Resource Conservation and Recovery Act, 42 U.S.C. § 6973, may be applied retroactively. *See United States v. Price*, 523 F.Supp. 1055, 1057, 1071–72 (D.N.J.1981). Indeed, Alcoa cites no case, and this Court has found none, which holds that CERCLA should not apply retroactively. *See O'Neil*

---

**4.** Alcoa does not argue that it is not a "covered person[ ]."

**5.** Amland vigorously contends that consistency with the NCP is not necessary for it to establish

liability, and that lack of consistency would go only to damages, not to liability. That argument will be addressed *infra*, Par II(A)(4).

*v. Picillo,* 682 F.Supp. 706, 729 (D.R.I. 1988).

Moreover, the reasoning of the courts holding proper the retroactive application of CERCLA is persuasive. As they note, the language of the statute providing for liability is couched in the past tense: "any person who at the time of disposal ... owned or operated," 42 U.S.C. § 9607(a)(2); "any person who arranged with a transporter ... for disposal," *id.* § 9607(a)(3); "any person who accepted any hazardous substances ... for transport." *Id.* § 9607(a)(4). In addition, because CERCLA authorized government and private parties to clean up abandoned waste sites and then seek recovery of the costs from responsible parties, the statute was intended to reach conduct (i.e., the abandonment of waste sites) that occurred prior to the date of CERCLA's passage. *See United States v. NEPACCO,* 810 F.2d at 733. Due process arguments against the retroactive application of CERCLA have been uniformly rejected on the ground that "the retroactive application of the legislation is itself justified by a rational legislative purpose," namely, the allocation of cleanup costs regarding abandoned waste sites to those parties responsible for creating those sites. *Id.* at 733–34, *citing Pension Benefit Guaranty Corp. v. R.A. Gray & Co.,* 467 U.S. 717, 730, 104 S.Ct. 2709, 2718, 81 L.Ed.2d 601 (1984); *see also O'Neil,* 682 F.Supp. at 729; *United States v. South Carolina Recycling & Disposal, Inc.,* 653 F.Supp. 984, 996–98 (D.S.C.1986); *United States v. Shell Oil Co.,* 605 F.Supp. 1064, 1072–73 (D.Colo.1985). And, finally, Alcoa has given this Court no reason why CERCLA should apply to pre–1980 conduct in actions brought by the federal or state government but should not apply to that conduct in actions brought by private parties. Accordingly, I hold that CERCLA is properly invoked here.[6]

### 2. *Disposal*

 The definition of "disposal," for the purposes of CERCLA, is set forth in the Solid Waste Disposal Act:

the discharge, deposit, injection, dumping, spilling, leaking, or placing of any solid waste or hazardous waste into or on any land or water so that such solid waste or hazardous waste or any constituent thereof may enter the environment or be emitted into the air or discharged into any waters, including ground waters.

42 U.S.C. § 6903(3) (incorporated at 42 U.S.C. § 9601(29)). Alcoa contends that the conduct most vigorously complained of here—the spilling of PCB-containing fluids onto the floor of an industrial plant—is not disposal "into or on any land or water," in that the interior of a building falls within neither of those categories. *See* Deft's CERCLA Opposition Br. at 25; Deft's CERCLA Reply Br. at 27–28. Alcoa also argues that the presence of PCBs on the asphalt outside the Edgewater plant does not evidence a disposal in that the asphalt is neither land nor water within the meaning of CERCLA, Alcoa was not responsible for that contamination, and the reported level of contamination is too low to support a finding of disposal. *Id.* at 29. I need not and, thus, will not address this latter argument because I find that disposal within the plant is disposal "into or on any land or water" within the meaning of CERCLA.

The few reported decisions concerning this issue have held that placement of hazardous wastes inside an enclosed manufacturing facility may constitute disposal of such waste into or on any land so as to satisfy the CERCLA definition. In *BCW Associates Ltd. v. Occidental Chemical Corp.,* Civ. No. 86–5947, 1988 WL 102641 (E.D.Pa. Sept. 29, 1988), the floors and fixtures of a warehousing facility came to be covered by a layer of dust as a result of the operations of Firestone Tire & Rubber Company, a previous tenant. *Id.* at 5. When the warehouse was reactivated, and used once more for the storage of goods, it was discovered that the dust was contaminated by lead. *Id.* at 8. Firestone, in an

---

**6.** Furthermore, I view the application of CERCLA to pre–1980 conduct as imposing liability not for past conduct but, instead, for the present and continuing effects of that conduct and, in that sense, the application of CERCLA is not retroactive but ameliorative.

attempt to avoid CERCLA liability, argued that disposal within the warehouse fell outside § 9601(29) in that such disposal was not disposal into or on land. The court rejected this "unduly narrow" interpretation of the definition of "disposal," noting that "[i]t is clear that Congress intended the term 'land' to encompass buildings and other types of real estate." *Id.* at 43; *see* 42 U.S.C. § 9607(a)(2) (holding liable owner or operator of a facility at which disposal occurs); § 9601(9) (defining facility as, *inter alia,* "any building structure, [or] installation"); *State of New York v. General electric Co.,* 592 F.Supp. 291, 296 (N.D.N.Y.1984) ("Indeed, it appears that Congress sought to deal [in CERCLA] with every conceivable area where hazardous substances come to be located ...").

In so holding, the *BCW Associates* court relied upon *Emhart Industries, Inc. v. Duracell Int'l, Inc.,* 665 F.Supp. 549 (M.D. Tenn.1987), a case cited and discussed by both parties before me. *Emhart* concerned PCB contamination of a manufacturing plant in Waynesboro, Tennessee, in which drums containing PCBs were stored in the building, PCBs had contaminated the floor and roof of the plant, and underground tanks containing PCBs were leaking. *Id.* at 555. The court applied the CERCLA definition of "disposal" to that situation:

> At Waynesboro, the spilling of PCBs during their use by Duracell in the manufacturing process, *as well as* the dumping of PCBs outside the plant, the flow of PCBs into the Green River, and the leaching of PCBs through the soil and into the groundwater during Duracell's ownership all constitute disposal under CERCLA.

*Id.* at 574 (emphasis added).

Alcoa reads this passage as holding that the spilling and storage of PCBs within a plant constitute disposal only if accompanied by dispersal of those PCBs into the

land or water. *See* Deft's CERCLA Opposition Br. at 26. That reading distorts the language quoted above, which indicates, at least to me, that the spilling of PCBs within the plant and the dumping of PCBs outside the plant, independently of one another, amount to a CERCLA disposal. Moreover, a disposal can be such that hazardous waste "may" enter the environment; under Alcoa's reading, a disposal would require that the waste in fact reach the environment. In view of Alcoa's failure to cite any case holding that disposal within a plant is not disposal "on any land," [7] and in view of *BCW Associates* and *Emhart,* I find that spills or leaks of PCBs within the Edgewater plant that were caused by Alcoa's operation of that plant are to be considered disposals within the meaning of CERCLA.

### 3. Release or Threatened Release

The term "release" is defined by CERCLA as any spilling, leaking, pumping, pouring, emitting, emptying, discharging, injecting, escaping, leaching, dumping, or disposing into the environment (including the abandonment or discarding of barrels, containers, and other closed receptacles containing any hazardous substance or pollutant or contaminant).

42 U.S.C. § 9601(22). As noted above, Amland must demonstrate that Alcoa's disposal of PCBs at the Edgewater plant resulted in "a release or a threatened release" of PCBs into the environment. Alcoa contends that there has been no actual release of PCBs into the environment in that testing of the ambient air and of the land surrounding the Edgewater plant has revealed no detectable PCBs, *see* Deft's CERCLA Opposition Br. at 29–30; Deft's App., Tabs 68–69, and in that the presence of one patch of PCB contamination in the asphalt, at less than 50 ppm concentration, is not sufficiently serious to be considered a release. *See* Deft's CERCLA Reply Br.

---

**7.** None of the cases cited by Alcoa—*American Mining Congress v. EPA,* 824 F.2d 1177, 1196 (D.C.Cir.1987) (Mikva, J., dissenting); *United States v. Waste Industries, Inc.,* 734 F.2d 159, 164 (4th Cir.1984) (hazardous waste in landfill); *United States v. Conservation Chemical,* 619

F.Supp. 162, 200 (W.D.Mo.1985) (waste in ground basin)—involve the placement of hazardous waste within a facility so that the waste may reach the environment. Thus, none are relevant here.

at 31–32. Alcoa also suggests that the absence of any actual release, in view of the "demolition and renovation work" already conducted by Amland at the Edgewater plant, is evidence that the PCB presence at the plant poses no threat of release. *See* Deft's CERCLA Opposition Br. at 29.

As with the term "disposal," courts have been inclined to give a broad reading to the terms "release" and "threatened release." One court observed that whereas the leaking from tanks containing hazardous waste constitutes an actual release, "the corroding and deteriorating tanks, [defendant's] lack of expertise in handling hazardous waste, and even the failure to license the facility, amount to a threat of release." *Shore Realty,* 759 F.2d at 1045. A similarly broad definition of "threatened release" was adopted by the court in *United States v. Northernaire Plating Co.,* 670 F.Supp. 742 (W.D.Mich.1987). In *Northernaire,* the federal government commenced a CERCLA action against an owner of a locked plant containing drums and tanks of chemicals. After finding the presence of an actual release, the court went on to discuss whether a threatened release had been established as well:

> The evidence shows that there were hazardous substances at the Northernaire site and that these substances, individually and collectively, would pose a threat to the population of the Cadillac, Michigan area if they were to be released into the environment. The evidence further demonstrates that none of the defendants were willing to take responsibility for ensuring that no such release would occur. The evidence of the presence of hazardous substances at the facility, when combined with the evidence of the unwillingness of any party to assert con-

trol over the substances, amounts to a threat of release.

*Id.* at 747. I, thus, turn to the facts of the case before me, keeping in mind the broad reading to be accorded the phrase "threatened release."

▮▮▮▮ There is evidence that the PCBs in the concrete flooring of the Edgewater plant have migrated further into the core of the concrete. *See* Brecher Aff., ¶ 11. In *Emhart,* the court specifically found that PCBs "can leach into the concrete flooring and ultimately the ground." 665 F.Supp. at 559. In part on the basis of this factual finding, the court held that, along with the leaking underground tanks, "the continued leaching and seepage from earlier spills at the Waynesboro plant are a release or threatened release." *Id.* at 574. The evidence before me indicates that the PCBs in the concrete flooring, if left unremedied, could eventually leach through to the soil under the Edgewater plant. I note that there is no requirement that an actual release have already occurred or be imminent; a threatened release, on its own, is sufficient under CERCLA. *See BCW Associates,* slip op. at 44 (even though there was no documented evidence of an actual release, evidence regarding dust in warehouse "showed that there was a threatened release of the lead dust on goods being shipped to [plaintiff's] customers and on the shoes and clothing of workers leaving the warehouse"). The presence of PCBs in the concrete flooring at the Edgewater plant constitutes a threatened release within the meaning of CERCLA.[8]

### 4. Consistency with the National Contingency Plan

The parties sharply disagree as to whether a plaintiff must plead and prove that

---

8. The presence in the Edgewater facility of the forty-five PCB-laden transformers constitutes a threat of release. *See Covalt v. Carey Canada, Inc.,* 860 F.2d 1434, 1437 (7th Cir.1988) (asbestos left as contaminant within plant); *O'Neil,* 682 F.Supp. at 724 (closed barrels of waste); *Northernaire,* 670 F.Supp. at 747 (barrels of hazardous waste within locked factory); 42 U.S.C. § 9601(22) (release includes abandonment of closed receptacles containing hazardous substances). However, the sale of the transformers by Alcoa did not satisfy the requirement that

there be a disposal, in that the transaction involved a sale of a useful product, rather than a sale of hazardous waste solely for the purpose of disposing of that waste. *See Prudential Insurance Co. v. United States Gypsum,* 711 F.Supp. 1244, 1253–54 (D.N.J.1989); *Edward Hines Lumber Co. v. Vulcan Materials Co.,* 685 F.Supp. 651, 654 (N.D.Ill.1988); *Jersey City Redevelopment Agency v. PPG Industries,* 655 F.Supp. 1257, 1260 (D.N.J.1987). Accordingly, the presence of the transformers at the Edgewater facility does not give rise to CERCLA liability on Alcoa's part.

response costs were incurred consistent with the NCP in order to establish liability under CERCLA. *Compare* Plff's CERC-LA Reply Br. at 35–39 *with* Deft's CERC-LA Reply Br. at 4–5. I find that the weight of recent authority in cases (like this one) of private party recovery actions holds that response costs incurred consistent with the NCP is an element of a CERC-LA plaintiff's case on liability. *See Ascon Properties, supra,* 866 F.2d at 1152–53; *BCW Associates,* slip op. at 42; *Versatile Metals v. Union Corp.,* 693 F.Supp. 1563, 1574 (E.D.Pa.1988); *Artesian,* 659 F.Supp. at 1291–92. Where, as here, there is a complete factual record upon which to make the determination of consistency *vel non,* there is nothing to be gained by delaying that determination until trial.[9]

The cases cited by Amland do not require a different result. The first set of cases— *United States v. Northernaire Plating, supra; Washington v. Time Oil Co.,* 1988 Haz. Waste Litig. Rep. (Andrews) 12,579 (W.D.Wash. Mar. 29, 1988); *United States v. Bliss,* 667 F.Supp. 1298 (E.D.Mo.1987); and *United States v. Medley,* 25 Env't Rep. Cas. (BNA) 1315, 1318 (D.S.C. Nov. 5, 1986) —all involved cleanups performed by the federal or state government. In such actions, the burden of proof is on the defendant to demonstrate that the costs incurred were inconsistent with the NCP, and, absent such demonstration, the costs incurred by the government are presumed to be not inconsistent. *See NEPACCO,* 810 F.2d at 747; *Artesian,* 659 F.Supp. at 1277 n. 8; 42 U.S.C. § 9607(a)(4)(A) (federal or state government may recover response costs that are "not inconsistent" with the NCP).

Conversely, in private recovery actions, the burden of proof is on the plaintiff to demonstrate that its costs were consistent with the NCP. *NEPACCO, supra; Artesian, supra.* Thus, the governmental cleanup cases referred to by Amland are neither helpful nor persuasive in a discussion of the liability of a private party plaintiff.

The one private party recovery action cited by Amland may be distinguished, for other reasons, from the case at bar.[10] In *T & E Industries, Inc. v. Safety Light Corp.,* 680 F.Supp. 696 (D.N.J.1988), the court entered partial summary judgment in favor of plaintiff, declaring that defendants were liable to plaintiff for all response costs incurred consistent with the NCP. *Id.* at 709. The court observed that the factual record did not permit, at that time, a determination of consistency with the NCP, so that summary judgment as to particular costs could not be entered. *Id.* In the matter before me, the factual record as to consistency is complete, and the question is ripe for decision. Moreover, whereas in *T & E* defendants did not contest a significant portion of plaintiff's asserted response costs, *see id.* at 706, all of Amland's response costs are disputed by Alcoa. Accordingly, "[t]his Court must address consistency with the NCP at this juncture in order to determine whether [plaintiff] is entitled to recover *any* of its response costs, and to avoid the risk of a pointless trial at some later date." *Artesian,* 659 F.Supp. at 1292 (emphasis in original).[11]

Costs incurred in responding to releases or threatened releases of hazardous waste are divided by CERCLA into two catego-

9. The complete factual record in this case renders inapposite *Sunnen Products Co. v. Chemtech Industries, Inc.,* 658 F.Supp. 276 (E.D.Mo. 1987), cited at Plff's CERCLA Reply Br. at 36 n. 125, in which consistency of costs could not be ascertained until the record was further developed.

10. Although not cited by Alcoa for this proposition, *City of Philadelphia v. Stepan Chemical Co.,* 544 F.Supp. 1135, 1144 n. 16 (E.D.Pa.1982), states in *dictum* that "the question of compliance with the national contingency plan appears to be related to the recovery of damages and not to the existence of a valid claim for relief." This statement is undercut by its reliance solely

on the legislative history of CERCLA, a history which has been held to "furnish[ ] at best a sparse and unreliable guide to the statute's meaning." *Artesian,* 851 F.2d at 648.

11. *Southland Corp. v. Ashland Oil, Inc.,* 696 F.Supp. 994 (D.N.J.1988), referred to by Amland's counsel at oral argument, relies exclusively upon *T & E* for its statement that a CERCLA liability determination may be made irrespective of compliance with the NCP. *Id.* at 1000. For the reasons expressed in the text, *supra, Southland,* like *T & E,* is distinguishable from the case before me.

ries. 42 U.S.C. § 9601(25). The first, removal actions, are defined as

> [t]he cleanup or removal of released hazardous substances from the environment, such actions as may be necessary taken in the event of the threat of release of hazardous substances into the environment, such actions as may be necessary to monitor, assess, and evaluate the release or threat of release.... The term includes, in addition, without being limited to, security fencing or other measures to limit access....

*Id.,* § 9601(23). All other responses are termed remedial actions, defined as

> those actions consistent with permanent remedy taken instead of or in addition to removal actions in the event of a release or threatened release ... to prevent or minimize the release of hazardous substances so that they do not migrate to cause substantial danger to present or future public health or welfare or the environment. The term includes ... neutralization, cleanup of released hazardous substances or contaminated materials
>
> ....

*Id.* § 9601(24).

Removal actions are to be taken in response to an immediate threat to the public welfare or to the environment, *see Versatile Metals,* 693 F.Supp. at 1577; 40 C.F.R. § 300.65(b)(2)(i)–(viii) (setting out factors for determining appropriateness of removal action), and are "primarily ... intended for the short-term abatement of toxic waste hazards." *Piccolini v. Samon's Wrecking,* 686 F.Supp. 1063, 1068 (M.D.Pa.1988). Remedial actions, on the other hand, "are generally considered long-term or permanent remedies." *T & E,* 680 F.Supp. at 706; *see BCW Associates,* slip op. at 47. The distinction between these actions is of no small importance, for whereas removal actions need only comply with the relatively simple NCP requirements set forth at 40 C.F.R. § 300.65, *see id.* § 300.71(a)(2)(ii); *BCW Associates,* slip op. at 50–51, remedial actions must comport with the "more detailed procedural and substantive provisions of the NCP" as set forth at 40 C.F.R.

§ 300.68. *See id.* § 300.71(a)(2)(ii); *Versatile Metals,* 693 F.Supp. at 1576.

■ Amland admits, as it must, that "the bulk of [its] response measures have been directed to a permanent remedy," and are governed by the NCP guidelines concerning remedial actions. *See* Plff's Strict Liability Br. at 7 n. 4. Two sets of initial responses are claimed by Amland to be removal actions: actions taken in order to rectify the accessibility of the site to trespassers (erecting a fence around the plant and providing a 24–hour guard), *see id.,* and Amland's "initial monitoring and assessment of [the] threatened release." *See* Plff's CERCLA Reply Br. at 40. As to the security guard and fencing, these measures—although clearly within the definition of "removal actions"—were undertaken by Amland prior to April 1985 when Amland states that it first became aware of the presence of PCBs at the Edgewater plant. *See* Deft's CERCLA Reply Br. at 9 n. 12, 33 n. 43; Deft's App., Tabs 1, 36–37, 46; Deft's Supp. App., Tab 1. Consequently, these measures cannot be said to have been undertaken in response to an immediate (or any) health or environmental threat, and the costs incurred cannot be recovered under CERCLA.

■ Any initial monitoring and assessment of the threatened release of PCBs at the Edgewater plant after April 1985 fall within the statutory definition of removal actions. *See* 42 U.S.C. § 9601(23); *T & E,* 680 F.Supp. at 706; *General Electric,* 592 F.Supp. at 298. Moreover, such initial monitoring costs are recoverable even absent any subsequent recoverable response costs. *Artesian,* 851 F.2d at 651; *Wickland Oil Terminals v. Asarco, Inc.,* 792 F.2d 887, 892 (9th Cir.1986). Finally, "the detailed NCP provisions governing other response actions cannot reasonably be applied to preliminary monitoring and evaluation of a release of hazardous substances." *Artesian,* 659 F.Supp. at 1294. Accordingly, any preliminary monitoring and evaluation costs incurred by Amland after April 1985 with respect to the presence of PCBs at the Edgewater facility are compensable under CERCLA, and Alcoa will be held

liable for its equitable share of those costs.[12]

The vast majority of the costs incurred by Amland to date are for the remedial actions undertaken in an attempt to remove the PCBs from the Edgewater plant. As noted above, these remedial actions must have been consistent with the NCP in order for Amland to recoup from Alcoa the costs incurred thereby. Again, I am faced with impassioned disagreement between the parties: is strict compliance with the requirements of the NCP mandated, as Alcoa contends, *see* Deft's Cross Motion Br. at 8–10; Deft's CERCLA Reply Br. at 3–7, or is only "substantial" compliance necessary, in view of "the NCP's specific, but flexible, requirements." Plff's Strict Liability Br. at 10. For the following reasons, I hold that the requirements of the NCP must be adhered to in order to permit a private party to recover its response costs, unless the party seeking recovery explains why a specific requirement is not appropriate to the specific site and problem.

As an initial matter, Alcoa and Amland agree that the EPA's interpretation of the NCP requirements is entitled to considerable deference. *See* Deft's CERCLA Reply Br. at 1; Plff's Strict Liability Br. at 9; *Chemical Manufacturers Ass'n v. Natural Resources Defense Council*, 470 U.S. 116, 125, 105 S.Ct. 1102, 1107, 84 L.Ed.2d 90 (1985) ("Th[e] view of the agency charged with administering the statute is entitled to considerable deference ...."). In explaining the 1985 amendments to the NCP section defining how private party actions can be consistent with the NCP, the EPA stated as follows:

> [B]ecause section 107 of CERCLA [42 U.S.C. § 9607] authorizes private cost recovery only for actions that are "consistent with" the NCP, EPA has an obligation, as promulgator of the NCP, to

explain how private actions may be so consistent....

> In this rule ... EPA has modified § 300.71 to specify in detail what private parties must do in order to act consistently with the NCP.

50 Fed.Reg. 47,934 (1985).

> To be consistent with the NCP for the purpose of cost-recovery under section 107 of CERCLA, [private party] responses must, as appropriate, address the full range of alternatives outlined in § 300.68(f), as well as comply with all other provisions of § 300.68(e) through (i). Such responses also must provide an opportunity for appropriate public comment. This public involvement must be consistent with § 300.67(d) ...

*Id.* at 47,935.

Courts applying § 9607 in the course of private party recoveries have read this language to mean that the NCP provisions must, when appropriate, be followed, and have accordingly measured private responses against the terms of the NCP. *See Versatile Metals*, 693 F.Supp. at 1576 ("[T]he failure to fulfill the more detailed procedural and substantive provisions of the NCP with regard to 'remedial' actions becomes a barrier to recovery of response costs"); *Artesian*, 659 F.Supp. at 1291–92 ("Congress plainly contemplated that the NCP would be a standard against which response actions would be judged appropriate or inappropriate in the first instance ..."), 1294–97 (comparison of NCP requirements with plaintiff's actions); *BCW Associates*, slip op. at 52 n. 3 (although NCP requirements "should not be applied in a Procrustean manner," compliance "is [not] reducible to an inquiry into whether the clean-up was cost-efficient and environmentally sound," citing 50 Fed.Reg. 47,934). Certainly, the EPA's interpretation of the NCP and the caselaw deferring to that interpretation support my holding

---

**12.** As noted *supra* note 3, no specific dollar amount is set forth regarding these monitoring costs. The extent of the third party defendants' culpability may be relevant in equitably distributing the monitoring costs as among the various allegedly responsible parties, as may any equitable *caveat emptor* argument directed at Amland. *See Smith Land*, 851 F.2d at 90. Moreover, Alcoa will be held liable for monitoring costs only insofar as Amland can prove, at trial, that the costs were referable to the still-disputed condition of the Edgewater plant at the time of sale by Alcoa.

that private party responses to releases or threatened releases of hazardous substances are consistent with the NCP if they adhere to the specific requirements of the NCP, absent a showing that one or more of those requirements are inappropriate under the particular circumstances.

Amland has not persuaded me otherwise. The EPA is quoted by Amland as being of the view that the NCP "is not intended to provide complex, detailed, specific decision-making criteria." Plff's Strict Liability Br. at 8 (quoting 50 Fed.Reg. 47,920). Accordingly, the argument goes, the NCP is to be applied flexibly. However, the quoted description of the NCP precedes the discussion of private party response cost recovery quoted earlier by fifteen pages and is, in fact, addressed to the wholly-distinct issue of the EPA's definition of "relevant and appropriate requirements" at 40 C.F.R. § 300.6. *See* 50 Fed.Reg. 47,918. Thus, the only relevant EPA interpretation of the NCP sections authorizing private party recovery is the interpretation that 40 C.F.R. § 300.71 "specif[ies] in detail what private parties must do" in order to be consistent with the NCP.

Amland also relies upon the Ninth Circuit's decision in *Wickland, supra,* for the proposition that "response costs incurred by a private party may be 'consistent with the [NCP]' so long as the response measures promote the broader purposes of the plan." 792 F.2d at 891; *see* Plff's Strict Liability Br. at 7–8. When quoted in full, however, it is clear that this language in *Wickland* is dictum:

On the other hand, these provisions [40 C.F.R. §§ 300.61–71] possibly do not constrain private parties seeking to recover response costs incurred under section 107(a) [of CERCLA]. Arguably, for example, section 107(a) does not require strict compliance with the national contingency plan; rather, response costs incurred by a private party may be 'consistent with the national contingency plan' so long as the response measures promote the broader purposes of the plan.

792 F.2d at 891. The court went on to hold that the issue (prior governmental approval of private responses) had been resolved by an EPA rule specifying that such approval was no longer required. *Id.* at 891–92.

In a case decided by the same panel on the same day, the Ninth Circuit held that compliance with the NCP "does not necessitate *strict compliance* with its provisions." *NL Industries v. Kaplan,* 792 F.2d 896, 898–99 (9th Cir.1986). This language, although broad, is tied to very narrow facts: all that the case held was that, in light of *Wickland*'s statement that governmental approval of private cleanups was not mandatory, the failure of a party to promptly report a release to the National Response Center—when that report was designed only to permit the government to approve the private response—did not render the response inconsistent with the NCP. *Id.* at 899. This is, in essence, a holding that the reporting requirement was no longer appropriate, and should no longer be required. It is not a holding that, where a requirement of the NCP is appropriate, a party is free to substitute its own conception of an equivalent course of conduct for that requirement. As such, I do not find *Wickland* and *NL Industries* to support the "substantial compliance" standard proposed by Amland and, to the extent those cases require that result, I choose not to follow them.

Having determined that Amland must, where appropriate, comply with the requirements of the NCP in order to recover its response costs, I turn to examine those requirements. 40 C.F.R. § 300.71(a)(2)(ii) states that a remedial action will be consistent with the NCP if the party

(A) Provides for appropriate site investigation and analysis of remedial alternatives as required under § 300.68;

(B) Complies with the provisions of paragraphs (e) through (i) of § 300.68;

(C) Selects a cost-effective response; and

(D) Provides an opportunity for appropriate public comment concerning the selection of a remedial action consistent with paragraph (d) of § 300.67 unless

compliance with the ... appropriate State and local requirements ... provides a substantially equivalent opportunity for public involvement in the choice of remedy.

■ Amland contends that the requirement of compiling a Remedial Investigation/Feasibility Study (hereinafter "RI/FS"), set forth in 40 C.F.R. § 300.68(d), is inapplicable to a private party response, in that the section quoted above makes reference only to § 300.68 generally and to § 300.69(e)–(i) specifically. *See* Plff's Strict Liability Br. at 11. This contention was rejected in *Versatile Metals*, 693 F.Supp. at 1539 ("Section 300.68(d) describes the necessary study" to be prepared by a private party) and in *Artesian*, 659 F.Supp. at 1296. Similarly, the EPA has concluded that "[f]or remedial actions, the most important factors that contribute to the final selection of a remedy are the scoping of response actions, the development of alternatives, and the detailed analysis of alternatives during the RI/FS." 50 Fed.Reg. 47,935. Moreover, Amland is specifically required to comply with § 300.68(e)–(i), which sections make repeated reference to the RI/FS requirement of § 300.68(d). I, therefore, conclude, as did the *Versatile Metals* and *Artesian* courts, that the RI/FS requirement applies to private party actions.

The RI/FS shall "determine the nature and extent of the threat presented by the release and ... evaluate proposed remedies." 40 C.F.R. § 300.68(d). The process is described in §§ 300.68(e)–(i). The RI process commences with the scoping of response actions, which is designed to determine "the type of response that may be needed to remedy the release." *Id.* § 300.68(e)(1). "Initial analysis shall indicate the extent to which the release or threat of release may pose a threat to public health or welfare or the environment, indicate the types of removal measures and/or remedial measures suitable to abate the threat, and set priorities for implementation of the measures." *Id.* In so doing, the RI process "shall, as appropriate," take into account fifteen specifically enumerated factors "in determining wheth-

er and what type of remedial and or removal actions will be considered." *Id.* § 300.68(e)(2).

The next step commences the FS process: "[t]o the extent that it is both possible and appropriate, at least one remedial alternative shall be developed as part of the feasibility study in each of [five listed] categories." *Id.* § 300.68(f)(1). Each alternative is to be screened according to the "broad criteria" of cost, acceptable engineering practices, and effectiveness. *Id.* § 300.68(g)(1)–(3). "When an alternative is eliminated in screening, the rationale shall be documented in the feasibility study." *Id.* The alternatives that survive this screening process are then to be subjected to a "more detailed analysis," taking into account, as appropriate, "refinement and specification of the alternatives," "detailed cost estimation," "evaluation [of] engineering implementation," evaluation of each alternative's efficacy, "analysis of ... advanced, innovative or alternative technologies," and "analysis of any diverse environmental impacts." *Id.* § 300.68(h)(2)(i)–(vi). The final RI/FS section requires "selection of a cost-effective remedial alternative that effectively mitigates and minimizes threats to and provides adequate protection of the public health and welfare and the environment." *Id.* § 300.68(i).

■ Amland's response to the release of PCBs may be divided into two components: the means by which Amland established the standard of cleanup (i.e., how clean the Edgewater plant was to be made), and the means by which Amland chose the remedial method that would achieve that standard. Both of these must be measured against the procedural and substantive requirements of the NCP. In so doing, I find that although the cleanup standard, as determined by DEP, was consistent with the NCP, the remedial methods have not been shown to be in compliance with the NCP. I turn first to the cleanup standard set for the Edgewater plant.

As set out above, DEP initially required of Amland that it achieve a cleanup level of zero ppm of PCBs at surface level, and 5

ppm below surface. The final ACO, however, set levels of 1 ppm for the surface and 5 ppm for below-surface. *Compare* Plff's Supp.App., Tab 35 at ¶ 16 (proposed ACO) *with* Plff's App., Tab 4 at ¶ 13A (final ACO). It appears clear from the record before me that, in setting this standard, DEP took into account Amland's planned use of the site as a residential area. *See* York/Hunter Minutes of Meeting of June 6, 1985, at ¶ 4 ("NJDEP stated that use of land for residential use is higher than that of ECRA [Environmental Cleanup Responsibility Act, N.J.S.A. 13:1K–6, governing transfer of industrial facilities] land requirements") (attached at Plff's App., Tab 75); Del Bene Dep. 27:8–10 ("I believe that the State did have a heightened awareness that this building was proposed for a residential use....") (attached at Plff's App., Tab 77); Final ACO, ¶ 1 (finding that Amland planned to use Edgewater site for residential homes).

For purposes of Alcoa's summary judgment motion, I will accept its statement that "the approach required by the NCP," with regard to the setting of a cleanup standard, involves consideration of the proposed end use of the property. Deft's CERCLA Reply Br. at 21 n. 29; *see* Plff's Supp.App., Tab 36 at 18–19 (EPA Superfund record of decision, taking into account possible exposure if property is later used as light industrial factory). In that light, Alcoa has given me no reason to believe that DEP's cleanup standard, which took into account Amland's intention to transform the Edgewater plant into residential units, would be any different from a cleanup standard established pursuant to the NCP, which requires consideration of proposed property use.[13] *See* 40 C.F.R. § 300.68(e) (during RI process, "[i]nitial analysis shall, as appropriate, also provide a preliminary determination of the extent to which ... other Federal criteria, advisories, and guidance and State standards are to be used in developing the remedy"). Accordingly, I find that the cleanup standard set by DEP—1 ppm surface, 5 ppm below-surface—was set consistently with the NCP.

With respect to the remedial method arrived at to achieve the DEP-imposed cleanup standard, Amland must again demonstrate compliance with the NCP. Initially, Amland was required to "comp[ly] with the provisions of paragraphs (e) through (i) of § 300.68." 40 C.F.R. § 300.71(a)(2)(ii)(B). Section 300.68(e)(2) lists fifteen factors which, for private party actions, "shall, as appropriate, be assessed in determining ... what type of remedial ... action will be considered." Of these, Amland has claimed to have taken into account five of the listed factors: § 300.68(e)(2)(i) (population at risk); (e)(2)(ii) (routes of exposure); (e)(2)(iii) (amount, concentration, and form of hazardous substances)[14]; (e)(2)(xii) (determination of applicable state standard); (e)(2)(xiii) (extent to which contamination levels exceed standard).[15] *See* Plff's Strict

---

**13.** Moreover, I reject any argument that Amland's decision to use the property for residential rather than industrial use somehow serves to bar recovery under CERCLA. *See, e.g.,* Deft's CERCLA Opposition Br. at 22. It may well be that Amland's decision to build condominiums will result in greater cleanup costs than would be engendered by a continuation of the property's industrial character. However, that is a cost that must fall upon the party responsible, in the first instance, for the contamination of the property; any other result would consign property, once polluted, to only those uses to which the property had been put prior to the contamination.

**14.** Amland asserts, Plff's Cross Motion Br. at 13, that its studies determined a correlation between the location of Alcoa's machinery and spots of PCB contamination. *See* Plff's Supp.

App., Tabs 5, 52 at p. 4. It characterizes these studies as satisfying § 300.68(e)(2)(xii)–(xiii) as to the amount, concentration, and migration of the hazardous substances. *Id.* at n. 13. I read the study as determining the amount and concentration of the PCB presence at the Edgewater plant, which falls within § 300.68(e)(2)(iii).

**15.** Amland asserts that DEP's establishment of the cleanup standard "addressed the adequacy of contamination containment," at § 300.68(e)(2)(x). *See* Plff's Cross Motion Br. at 15 n. 18. Amland has proffered no connection between the cleanup standard and the present containment at the Edgewater site, and I note that the cleanup levels have more to do with the level of contamination than with the adequacy of containment. Moreover, the final ACO does not contain any timetable for a completion date (*see* ACO, ¶ 16), which date would have indi-

Liability Br. at 13–15, n. 10, 12–13, 15, 18. The factors not considered by Amland include § 300.68(e)(2)(iv) (hydrogeological factors, such as soil permeability); (e)(2)(v) (current and potential groundwater uses); (e)(2)(vi) (climate); (e)(2)(vii) (extent to which source can be identified); (e)(2)(ix) (likelihood of future releases); (e)(2)(x) (adequacy of natural or man-made barriers); (e)(2)(xi) (extent of migration of substance); and (e)(2)(xiv) (air, land, water, and/or food chain contamination). Amland excuses this non-consideration by simply observing that "[c]onsideration of the remaining factors listed as part of the site investigation was not 'appropriate' or necessary," specifically citing only § 300.68(e)(2)(iv)–(vi). See Plff's Strict Liability Br. at 15 n. 18. Without explanation as to why the remaining eleven factors to be considered in the scoping process of ¶ 300.68(e) were irrelevant, I cannot find that Amland has demonstrated that those factors were not "appropriate" to the cleanup of the Edgewood plant.

The next step in the process, the development of alternatives, requires that, as appropriate, remedial alternatives be developed in each of five listed categories. 40 C.F.R. § 300.68(f)(1). The only category in which an alternative was developed by Amland was § 300.68(f)(1)(ii), which calls for alternatives that attain the applicable remedial standard. See Plff's Strict Liability Br. at 16 and n. 23. Amland maintains that two of the remaining categories, § 300.68(f)(1)(i) (treatment at off-site facility), see Plff's Strict Liability Br. at 17 n. 28, and (f)(1)(v) (no-action alternative), see Plff's Strict Liability Br. at 16 n. 22, are inapplicable. While the DEP's action in

setting (and seeking to enforce) a cleanup standard may have precluded a no-action alternative, it is unclear why treatment of certain contaminated objects at an off-site facility would be an inappropriate alternative. Moreover, Amland provides no reason why the remaining viable category—alternatives that exceed the applicable standard, § 300.68(f)(1)(iii)—was not studied.[16]

Amland was next required to conduct the initial screening of the alternatives developed under § 300.68(f), according to the criteria of cost, acceptable engineering practices, and effectiveness. 40 C.F.R. § 300.68(g). The alternatives screened by Amland assertedly included encapsulation, Plff's Strict Liability Br. at 15–16, use of solvents and microwaves, id. at 16–17, and removal, scarification, and decontamination (the methods ultimately utilized). Id. at 17. The studies submitted to me indicate that Amland tested cleaning surfaces with water and sand, water and surfactant, and dry sand blasting, see Plff's Supp.App., Tab 41, and that it planned to conduct a test of cleaning with microwaves. Id., Tab 42.[17] Although these studies may comport with §§ 300.68(g)(2) and (g)(3), which require consideration of engineering practices and effectiveness, neither study addresses the cost-effectiveness factor of § 300.68(g)(1).[18] In addition, none of the remedial alternatives listed above was subjected to the detailed analysis of §§ 300.68(h)(2)(i)–(vi), an issue not addressed in Amland's submissions. Finally, as to the alternatives not adopted by Amland, such as the use of solvents and microwaves, no documentation is provided as to why those alternatives were not chosen; rather, all that is

---

cated whether DEP viewed the Edgewater plant's containment as adequate.

**16.** I recognize that § 300.68(f)(1)(iv), which requires a study of alternatives that do not meet the applicable standards, was rendered irrelevant by the DEP's action.

**17.** The other cited exhibit, Tab 43, is simply a description of O.H. Material's remedial plan and, as such, provides no insight as to how the plan was formulated.

**18.** Although Amland makes reference to "cost[ing]" the various remedial methods, Plff's Strict Liability Br. at 18–19, the exhibits sub-

mitted do not permit this Court to assess any such "costing." Neither the Berk Memorandum of January 27, 1986 (attached at Plff's Supp. App., Tab 44), the meeting notes of January 9, 1986 (attached at Tab 53), nor the notice for solicitation of bids (attached at Tab 55) provides any total costs for any given method, or provides any means by which the relative cost-effectiveness of the various methods may be compared. Accordingly, I am unable to conclude that Amland complied with § 300.71(a)(2)(ii)(C), which requires a party to choose a cost-effective response.

submitted is an affidavit stating that "the technology for such use was not proven." Brecher Aff., ¶ 15. More than this is required to enable a reviewing court to determine the reasonableness of that determination. *See* 40 C.F.R. § 300.68(g)(1) ("When an alternative is eliminated in screening, the rationale shall be documented in the feasibility study"); *BCW Associates* at 52 n. 3 (noting importance of documenting "why [plaintiffs] chose the response action they did").

Finally, Amland was required to provide an opportunity for public comment concerning the remedial action to be selected. 40 C.F.R. § 300.71(a)(2)(ii)(D). The NCP mandates that

> feasibility studies that outline alternative remedial measures must be provided to the public for review and comment for a period of not less than 21 calendar days. Such review and comment shall precede selection of the remedial response. Public meeting(s) shall, in most circumstances, be held during the comment period.

*Id.*, § 300.67(d). The public comment requirement pertains to all response costs incurred subsequent to February 18, 1986, *see Versatile Metals*, 693 F.Supp. at 1577, a date seven months prior to the signing of the final ACO by Amland. It is undisputed that no public review and comment period took place here.

Amland makes two arguments in an attempt to justify that absence. First, it contends that the participation of state and local officials, and the participation of DEP in the standard-setting process, obviated the need for a public comment period. *See* Plff's Strict Liability Br. at 21, 23. However, the NCP itself mandates that, even when a cleanup is being conducted by EPA or a state agency such as DEP, a public comment period be implemented. *See* 40 C.F.R. § 300.67(d). Moreover, because the cleanup was a result of negotiations between DEP and Amland, rather than the result of a duly promulgated (and therefore commented upon) state regulation, the public had no opportunity to comment on either the cleanup standard or the remedial methods to be employed. I also reject Amland's

second argument that, because Alcoa had an opportunity to comment upon Amland's proposed response action, it has no standing to complain of the lack of a public comment period. *See* Plff's Strict Liability Br. at 22–23. It is Amland's burden to demonstrate compliance with the regulatory framework, and Alcoa, as a party sought to be held liable pursuant to that framework, will be heard as to any aspect of Amland's alleged non-compliance.

The foregoing discussion makes clear that Amland has failed to do that which the NCP requires, and has failed to come forward with sufficient reasons why that failure should be excused. Thus, although I find that Amland's initial monitoring and evaluation costs after April 1985 are recoverable, the remaining response costs incurred by Amland are not. As noted by the *Artesian* court:

> Congress did not intend for CERCLA, a narrowly drawn federal remedy, to make injured parties whole or to be a general vehicle for toxic tort actions. Unless Congress sees fit to provide such a remedy, full compensation for hazardous waste harms will in most instances remain the province of state law.

659 F.Supp. at 1299–1300. It is to New Jersey law that I now turn my attention.

## B. Common Law Claims

Amland brings four pendent state law claims against Alcoa, sounding in strict liability, private nuisance, public nuisance, and negligence. Amland seeks summary judgment as to the first of these, and Alcoa seeks summary judgment as to all four. For the reasons that follow, both motions will be denied as to the strict liability claim, and Alcoa's motion will be granted as to the remaining claims.

### 1. Strict Liability

Amland asserts that, under *State Dep't. of Environmental Protection v. Ventron*, 94 N.J. 473, 468 A.2d 150 (1983), and its progeny, Alcoa's operations at the Edgewater plant, and the condition in which it left that plant, were abnormally dangerous and give rise, as a matter of law, to strict liability. Alcoa, on the other hand, con-

tends that strict liability has no application where, as here, a vendee seeks to recover from a remote vendor for the vendor's activities on the property. Moreover, it contends that if strict liability is applicable here, the determination as to whether its activities were abnormally dangerous cannot now be decided as a matter of law. For the following reasons, I find that the concept of abnormally dangerous activity applies as between successive landowners, that the activity here must be measured in light of the relevant strict liability factors (rather than as a matter of law), and that summary judgment is not appropriate at this time.

Alcoa argues that it cannot be held liable for even abnormally dangerous activities by Amland, a subsequent purchaser of the property. *See* Deft's Cross–Motion Br. at 27–29. I begin my discussion by recounting the facts underlying the Appellate Division's decision in *T & E Industries, Inc. v. Safety Light Corp.*, 227 N.J.Super. 228, 546 A.2d 570 (App.Div.1988), a case to which I attribute significant weight. From 1917 through 1926, defendant's corporate predecessor operated a radium-processing facility on the site in question, and buried radioactive waste on that property. 227 N.J.Super. at 231, 546 A.2d 570. Fifty years later, plaintiff purchased the property, with no knowledge of the presence of radioactive waste. The *T & E* court first held that, as a matter of law, the deposit by defendant's predecessor of the radioactive waste on the property was an abnormally dangerous activity. *Id.* at 239–40, 546 A.2d 570.

Next, the court rejected defendant's argument that the principles of *Ventron* apply only to instances of interference with a neighbor's property, and not to instances of harm to successive landowners. *Id.* 227 N.J.Super at 241, 546 A.2d 570. In rejecting this distinction, the court observed that it saw "no practical or legal distinction between the rights of a successor in title to use and enjoy its land and the rights of a neighboring property owner." *Id.* The court then continued as follows:

Of course, the rights of the parties in the sale of real estate can be fixed and adjusted by contract. But here, we are dealing with an innocent purchaser which had no notice of the contaminated condition of the property, a latent defect. We are not addressing the question of fraud but merely stating that the liability may be altered by contract in appropriate circumstances.

*Id.* In cases involving abnormally dangerous activities, "[t]he party who creates such a[n abnormally dangerous] condition is absolutely liable and cannot avoid that responsibility unless a purchaser knowingly accepts that burden." *Id.* at 242, 546 A.2d 570. Accordingly, because the purchasers in *T & E* did not purchase the property with knowledge that radioactive contaminants were present, the disposers of those contaminants—the remote vendors of the property—were held strictly liable.

■ Alcoa argues that *T & E* "recognized the traditional defense to the imposition of strict liability—assumption of the risk." Deft's Common Law Reply Br. at 9. Because, the argument continues, Amland inspected the Edgewater plant and chose, despite warning, not to test for PCBs, Amland is not the "innocent purchaser" contemplated by the court in *T & E*, and assumed the risk that a toxic contaminant might be present at the site. *Id.* at 10–11. It is clear, however, that assumption of the risk in strict liability actions can be raised as a defense only "where a plaintiff with actual knowledge of the danger presented by the defective product knowingly and voluntarily encounters that risk." *Suter v. San Angelo Foundry & Machine Co.*, 81 N.J. 150, 158, 406 A.2d 140 (1979); *See Colella v. Safway Steel Products*, 201 N.J. Super. 588, 591, 493 A.2d 634 (Law Div. 1985) (contributory negligence available only when "plaintiff voluntarily and unreasonably encounters a known risk"); Restatement (2d) of Torts, § 523, comment c (regarding strict liability, "the plaintiff does not assume the risk unless he knows of its existence"). "[T]he ordinary contributory negligence of the plaintiff in failing to discover an abnormally dangerous activity or to take precautions against it is not a defense to the strict liability of the actor

who carries it on." *Id.* at comment a; *see Suter,* 81 N.J. at 158, 406 A.2d 140. Because the most that can be said here is that Amland negligently did not discover the presence of PCBs, and because it certainly cannot be said that Amland knew of the PCBs when it purchased the Edgewater plant, Alcoa may not raise assumption of the risk as a defense to liability.[19]

 Alcoa urges me not to follow the holding of *T & E* that strict liability for abnormally dangerous activities may be applied as between successive landowners. It asserts that the *T & E* court incorrectly stated that "no practical or legal distinction" exists as between neighboring landowners and successive landowners *vis-a-vis* their rights to the enjoyment of their land. Deft's Common Law Reply Br. at 15. Alcoa points to the following distinction:

A subsequent purchaser can protect itself concerning the condition of the property by, among other things, inspection of the property before purchase (to determine whether to proceed), express

contractual provisions, and reflection of condition in the purchase price.

*Id.* at 16. The *T & E* court did, indeed, recognize the ability of a successor in title to contractually fix its rights in the course of its purchase of the property. *See* 227 N.J.Super. at 241, 546 A.2d 570. This ability, however, is simply not sufficient to overcome the imposition of strict liability resulting from an abnormally dangerous activity. It is not enough, as Alcoa would have it, that Amland could have protected itself by lowering the purchase price (or by not purchasing at all) in light of an abnormally dangerous condition of which it should have known; rather, under the Restatement (2d) of Torts, §§ 519–20, and under New Jersey law, Amland must knowingly have contracted to accept that condition. Because Amland undisputably did not do so here, *T & E* is on point.[20] Accordingly, I find that the Supreme Court of New Jersey would impose strict liability as between successive landowners for the undertaking of an abnormally dangerous activity.[21]

19. Alcoa relies upon the Third Circuit's decision in *Philadelphia Electric Co. v. Hercules, Inc.,* 762 F.2d 303, 314 (3d Cir.1985), to support the proposition that a subsequent real property vendee may not impose strict liability upon a predecessor vendor, in view of the ability of the parties "to protect themselves through inspection and negotiation." Deft's Common Law Reply Br. at 16. *Philadelphia Electric,* however, addressed claims of private and public nuisance, not claims of abnormally dangerous activity. As noted above, the ability to protect oneself by contract is by itself insufficient to avoid strict liability; one must, in fact, have contracted to assume the risk under such circumstances.

20. The "as is" contracts between Alcoa and Tri-Terminal, in 1968, and between Citibank and Amland, in 1983, cannot serve to insulate Alcoa from liability for an allegedly abnormally dangerous activity. *See* Deft's Common Law Reply Br. at 608. Even setting aside my doubts that an "as is" contract clause precludes claims other than those based on breach of warranty, *see Southland Corp. v. Ashland Oil, Inc.,* 696 F.Supp. 994, 1001 (D.N.J.1988), I cannot accept the proposition that a party, ignorant of the presence of an abnormally dangerous condition, may be held to have contractually assumed the risk posed by that condition merely by signing an "as is" purchase contract. Under the Restatement and New Jersey law, as noted, strict liability may be avoided only by a knowing agreement to accept the risk of an abnormally haz-

ardous activity, and an "as is" contract, under the circumstances here, does not amount to a knowing agreement.

21. In predicting how the Supreme Court of New Jersey would hold, I am of course not bound by the decisions of appellate courts, such as *T & E. See Pennsylvania Glass Sand Corp. v. Caterpillar Tractor Co.,* 652 F.2d 1165, 1167 (3d Cir.1981). However, I "must attribute significant weight to these [appellate] decisions in the absence of any indication that the highest state court would rule otherwise." *Wisniewski v. Johns-Manville Corp.,* 759 F.2d 271, 273–74 (3d Cir.1985). *See also Casualty & Surety Co. v. Farrell,* 855 F.2d 146 (3d Cir.1988).

Alcoa also maintains that the rule in *T & E* should not be applied retroactively. *See* Deft's Common Law Reply Br. at 20 n. 23. Although its retroactivity argument is quite sparse, Alcoa appears to contend that the *T & E* court's holding—that strict liability may be imposed as between successive landowners—was a clear break from the past state of the law, and that Alcoa sold the Edgewater property "as is" in reliance on the old rule that liability between vendor and vendee could, under any circumstances, be limited by contract. Although I agree (for the purposes of this argument) that the imposition of strict liability between successive landowners has frustrated Alcoa's attempt to contractually eliminate its liability for the condition of the Edgewater property, I do not

Whether strict liability is to apply here is, of course, another matter. As the parties recognize, the discussion of strict liability must begin with *Ventron*, the seminal case regarding liability for the disposal of hazardous waste. In *Ventron*, the corporate defendants had, from 1929 to 1976, operated a mercury processing operation on a forty acre plot of land adjacent to Berry Creek, an estuary of the Hackensack River that flows through the Meadowland Basin. 94 N.J. at 481–82, 468 A.2d 150. The untreated waste material was dumped onto the tract, with the result that the land came to contain 268 tons of toxic waste, primarily mercury. *Id.* at 483, 468 A.2d 180. Because of the dumping of waste on the site, Berry's Creek gradually developed an extremely high concentration of mercury and fish could no longer survive. *Id.* at 481, 468 A.2d 180.

In an action brought by DEP to hold defendants liable for the costs of removing the mercury from the tract of land and Berry's Creek, the Supreme Court of New Jersey undertook to determine whether defendants had conducted an abnormally dangerous activity by disposing of the mercury on the land. The Supreme Court commenced its discussion by observing that, under the analysis of the Restatement (2d) of Torts, § 519–20, which it was thereby adopting, "whether an activity is abnormally dangerous is to be determined on a case-by-case basis, taking all relevant circum-

agree that Alcoa has met its burden of demonstrating that *T & E* should be accorded only prospective effect.

The decision whether or not to apply a court decision retroactively involves essentially "an equitable balancing test." *Coons v. American Honda Motor Co., Inc.*, 96 N.J. 419, 426, 476 A.2d 763 (1984). The factors to be applied are: (1) whether the decision to be applied "establish[ed] a new principle of law;" (2) whether the retroactive application of the new rule "will further or retard its operation;" and (3) whether "injustice or hardship" would result from a retroactive application, in that the party justifiably relied upon the old rule of law. *Chevron Oil Co. v. Huson*, 404 U.S. 97, 106–07, 92 S.Ct. 349, 355–356, 30 L.Ed.2d 296 (1971). The Supreme Court of New Jersey has observed that these factors "most frequently" call for retroactive application, *Coons*, 96 N.J. at 425, 476 A.2d 763, and that retroactive application is "[t]he traditional view." *Mirza v. Filmore Corp.*, 92 N.J. 390, 396, 456 A.2d 518 (1983).

I will assume, again for the purposes of this argument, that *T. & E.*'s application of strict liability principles as between vendor and vendee amounted to a clear break with the past. *See United States v. Johnson*, 457 U.S. 537, 551, 102 S.Ct. 2579, 2587–2588, 73 L.Ed.2d 202 (1982). The second *Chevron* factor, however, counsels retroactive application of *T & E*. New Jersey courts have recognized that "the dumping of untreated hazardous waste is a critical societal problem in New Jersey," *Ventron*, 94 N.J. at 492, 468 A.2d 150, and that the imposition of strict liability for such dumping represents "a strong statement of [this state's] underlying social policy." *Kenney v. Scientific, Inc.*, 204 N.J. Super. 228 at 247, 497 A.2d 1310 (1985). The rule set down in *T & E* was plainly intended to further the state's interest in apportioning liability for hazardous waste to those responsible for the waste's creation, *see* 227 N.J.Super. at 243–44, 546 A.2d 570, and was applied in that case to

conduct which had occurred more than fifty years earlier. The policy rationale underlying the *T & E* court's ruling would undoubtedly be hindered by a non-retroactive application of that decision, in that a great deal of the present waste problem in New Jersey is the result of "yesterday's mistakes ... for which yesterday's perpetrators must be held responsible." *Id.* at 239, 546 A.2d 570.

The third *Chevron* factor similarly favors retroactivity in that no inequity would result from such application. The activity engaged in by Alcoa (considered in the light most favorable to Amland) consisted of the disposal of a hazardous waste within a building, which waste is seeping towards soil. At the time Alcoa engaged in that activity, it knew or should have known that, in the event the waste were to reach an adjoining property and cause harm there, Alcoa would be held strictly liable. The mere fortuity that the waste has been discovered and steps taken to slow its progress prior to the time when the waste might reach a neighboring lot, does not make the imposition of strict liability inequitable. In disposing of the waste in 1968, Alcoa could not have justifiably relied upon the pre-*T & E* rule that strict liability did not apply between successive landowners, for it could not have known that the waste of which it disposed would remain only on the Edgewater site. Alcoa, having disposed of that waste, will not be heard to contend that retroactive application of *T & E* is unfair merely because the waste had not, prior to its discovery, travelled far enough so as to harm a neighboring lot.

The test enunciated in *Chevron*, and adopted by the Supreme Court of New Jersey in *Coons*, does not call for a limitation upon the retroactive application of *T & E*. If the Appellate Division in *T & E* thought it equitable to apply the "new" rule to activities of fifty years earlier, I cannot find that the Supreme Court of New Jersey would find retroactive application here inequitable.

stances into consideration." 94 N.J. at 491, 468 A.2d 150. According to the Restatement, the following six factors are to guide the determination:

(a) existence of a high degree of risk of some harm to the person, land or chattels of others;

(b) likelihood that the harm that results from it will be great;

(c) inability to eliminate the risk by the exercise of reasonable care;

(d) extent to which the activity is not a matter of common usage;

(e) inappropriateness of the activity to the place where it is carried out; and

(f) extent to which its value to the community is outweighed by its dangerous attributes.

Restatement (2d) of Torts, § 520 (quoted in *Ventron,* 94 N.J. at 492, 468 A.2d 150).

As to the first factor, the *Ventron* court noted that "[p]ollution from toxic wastes that seeps onto the land of others and into streams necessarily harms the environment." 94 N.J. at 492, 468 A.2d 150. The magnitude of the harm was found to be substantial, on the basis of two findings by the lower courts: first, that the "contamination of the entire tract" led to "ground water contamination via leachate, surface water contamination via runoff or overflow, and poison via the food chain"; and, second, that the deposited waste "form[ed] an even more toxic compound" by combining with other waste elements or with elements in the environment. *Id.*

In weighing the third factor, the court stated that "no safe way exists to dispose of mercury simply by dumping it onto land or into water." *Id.* There was no discussion of the fourth factor, the extent to which the activity was not a matter of common usage. As to the inappropriateness of the activity to the place in which it is conducted, the Supreme Court observed that "disposal of mercury is particularly inappropriate in the Hackensack Meadowlands, an environmentally sensitive area where the arterial waterways will disperse the pollution through the entire ecosytem." *Id.* With regard to the sixth and final factor, the extent to which the value of the

activity to the community is outweighed by its dangerousness, the Court found that "the dumping of untreated hazardous waste is a critical societal problem in New Jersey." *Id.* The *Ventron* court concluded as follows:

From the foregoing, we conclude that mercury and other toxic wastes are 'abnormally dangerous,' and the disposal of them, past or present, is an abnormally dangerous activity. We recognize that one engaged in the disposing of toxic waste may be performing an activity that is of some use to society. Nonetheless, 'the unavoidable risk of harm that is inherent in it requires that it be carried on at his peril, rather than at the expense of the innocent person who suffers harm as a result of it.'

... [The defendants'] activity has poisoned the land and Berry's Creek. Even if they did not intend to pollute or adhered to the standards of the time, all of these parties remain liable. Those who poison the land must pay for its cure.

*Id.* at 493, 468 A.2d 150 (citation omitted).

 As an initial matter, Alcoa argues that its activities did not involve the disposal of hazardous waste, as that phrase is used in *Ventron* and succeeding cases. In *Ventron,* the court was faced with the dumping of a toxic substance onto land adjacent to a creek. In *T & E,* the activity at issue was the burial of radioactive waste by defendants on their property. *Id.* 227 N.J.Super. at 231, 546 A.2d 570. Similarly, *Kenney v. Scientific, Inc.,* 204 N.J.S. 228, 235, 497 A.2d 1310 (Law Div.1985), involved the dumping of hazardous waste in a landfill. In contrast, Alcoa's argument continues, Amland alleges not that Alcoa "t[oo]k PCB-containing waste from the buildings where they were generated and deposit[ed] them elsewhere," but that "Alcoa did not, prior to sale of the property in 1968, remove from the buildings residues of PCB-containing fluids used in Alcoa's normal manufacturing process." Defendant's Reply Brief in Support of Summary Judgment Motion on Plaintiff's Common Law Claims (hereinafter "Deft's Common Law Reply Br.") at 14. The latter activity, it con-

cludes, is sufficiently dissimilar from the former as to render *Ventron* inapplicable.

I recognize that the activity engaged in by Alcoa may well be found to be significantly less egregious than the activity at issue in *Ventron, T & E,* and *Kenney.* I cannot find, however, that the activity would not be described by the Supreme Court of New Jersey as "disposal." Alcoa left at the Edgewater plant PCB-containing stains in the floor of the facility, which stains are leaching towards the groundsoil upon which the plant rests. Undoubtedly, in deciding whether these actions constitute a disposal of waste, the Supreme Court would be guided by the definitions of that term in CERCLA and in the New Jersey Spill Act, both of which include "spilling" and "leaking" as disposal or discharge. *See* 42 U.S.C. § 9601(29); N.J.S.A. 58:10–23:11b(h). Given these considerations, and given the strong public policy in this state concerning the use and storage of toxic substances, I predict that the Supreme Court of New Jersey would consider Alcoa's actions here to amount to disposal.[22]

Amland contends that the Supreme Court in *Ventron* determined, as a matter of New Jersey law, that disposal of toxic wastes is an abnormally dangerous activity and, thus, that analysis of the factors set forth in Restatement ¶ 520 is unnecessary and inappropriate. *See* Plff's Cross–Motion Br. at 46; Plff's Cross–Motion Reply Br. at 26–27. In so arguing, Amland relies on *T & E,* 227 N.J.Super. at 239, 546 A.2d 570 ("Our Supreme Court has concluded [in *Ventron* ] as a matter of law that handling toxic waste is an abnormally dangerous activity") and *Kenney,* 204 N.J.Super. at 247, 497 A.2d 1310, neither of which, it argues, undertook specific consideration of the Restatement factors, and both of which instead considered only *Ventron.*

Although I recognize that I must accord considerable deference to the decisions of a state appellate court concerning issues of state law, I find that *Ventron* and its progeny do not require that Alcoa's activity be deemed abnormally dangerous as a matter of law. The Supreme Court in *Ventron* specifically described Restatement § 520 as requiring a "case-by-case" analysis, "taking all relevant circumstances into consideration." 94 N.J. at 491, 468 A.2d 150. As the above discussion of *Ventron* indicates, the Supreme Court weighed four of the six Restatement factors in light of evidence or circumstances specifically present in that case: factors one (seepage of waste onto land and into streams); two (contamination of food chain and of ground and surface water); three (waste combined with other elements to form a more toxic compound), and five (disposal especially inappropriate in Meadowlands). *See id.* at 492, 468 A.2d 150. I am supported in this understanding of *Ventron* both by the language of Restatement § 520, *see* comment f ("In determining whether the danger is abnormal, the factors listed in clauses (a) to (f) of this Section are all to be considered, and are all of importance ... Because of the interplay at these various factors, it is not possible to reduce abnormally dangerous activities to any definition"), and by the decision of the Honorable H. Lee Sarokin in *Jersey City Redevelopment Authority v. PPG Industries,* Civil No. 85–2014, slip op. at 12–13 (D.N.J. Sept. 3, 1987) (applying § 520 factors to specific circumstances of case).[23]

The decisions in *T & E* and *Kenney,* properly considered in light of the facts of those cases, do not alter this result. In both of those cases, as in *Ventron,* defendants were charged with the direct disposal of toxic wastes into the land so as to poison

---

**22.** Although I have found that Alcoa did not, under CERCLA, dispose of the 45 PCB-laden transformers, *see supra* n. 8, I make no prediction as to whether the presence of those transformers at the Edgewater facility would amount to a disposal of hazardous waste under *Ventron.*

**23.** Judge Sarokin applied the Restatement factors in *PPG* to a fact pattern—the use of

contaminated mud as landfill material—that is far closer to the facts of *Ventron* than is the case before me. Moreover, I note that the Third Circuit, in an unpublished opinion which cannot be accorded precedential value, *see* Third Circuit Internal Operating Procedures, Chapter V(F)(1), specifically affirmed Judge Sarokin's application of the Restatement factors.

both the land and the waters. Thus, the lower courts in *T & E* and *Kenney* could follow the Supreme Court's weighing of the Restatement factors in *Ventron*, because all three cases were, with regard to the Restatement factors, factually congruent. The Appellate Division in *T & E* and the Law Division in *Kenney* might have been correct, then, to say that, on the facts of those cases, *Ventron* precluded an independent re-weighing of the Restatement factors. In the case before me, the "disposal" took place in a building during the course of a manufacturing process, and there is no evidence that, at the moment, any land or water has been contaminated. The facts of this case are considerably different from the facts of *Ventron, T & E,* and *Kenney*, and I find that the six factors of Restatement § 520 must be applied to the specific circumstances herein.

I note in passing that I take issue with Alcoa's characterization as to what certain of the Restatement factors require. First, I am not as certain as Alcoa appears to be that a defendant's knowledge of the risk is a necessary finding under Restatement § 520. *Compare* Deft's Common Law Reply Br. at 43 *with T & E,* 227 N.J.Super. at 240, 546 A.2d 570 ("neither *Ventron* nor the Restatement makes knowledge of the danger a controlling factor"); *State Department of Environmental Protection v. Lewis,* 215 N.J.Super. 564, 576, 522 A.2d 485 (App.Div.1987) (*Ventron* holds that "those who pollute the land must pay for its cure regardless of whether or not their acts were intentional"). Regarding factor four, the prevalence of PCBs in manufacturing processes may not be "a matter of common usage," which must be "customarily carried on by the great mass of mankind or by many people in the community." Restatement § 520, comment i (also noting that production of oil is not a matter of common usage). In addition, the activity challenged here is not the use of PCBs in a manufacturing process, but the disposal of those PCBs within the confines of a factory; it is the latter activity which Alcoa must show as "common." Similarly, with regard to factor six, the value to the com-

munity must arise not from the use of PCBs, but from the disposal thereof.

■ Both parties agree that, if I apply the Restatement factors, questions of fact remain that would preclude entry of summary judgment. *See* Plff's Cross–Motion Reply Br. at 27–28; Deft's Common Law Reply Br. at 28 n. 30 (if Amland contends that Alcoa could be held liable under the specific factors of § 520, "a question of fact would necessarily exist"). Because I conclude that the factors of Restatement § 520 must be applied to the specific circumstances of this case, and because I agree that questions of fact remain, summary judgment for either party as to the application of those factors is premature, and the cross-motions will be denied.

### 2. *Private Nuisance*

■ Alcoa contends that it may not be held liable to Amland under a theory of private nuisance because nuisance "involves interference with enjoyment of land by a neighbor['s] contemporaneous action," and here the "nuisance" affects only the land which Amland purchased. Deft's Common Law Reply Br. at 21. In response, Amland contends that Alcoa's argument essentially amounts to a claim of *caveat emptor,* and that the Appellate Division in *T & E* rejected *caveat emptor* under circumstances similar to the case at bar. *See* Plff's Cross–Motion Br. at 51–53. For the reasons that follow, I find that Amland does not state a claim for private nuisance.

The Restatement (2d) of Torts, § 822, makes clear that the concept of a private nuisance has been traditionally confined to instances either of one person's property use interfering with another's use of property, or of property use injuring third parties. *See* comment g, at 112 ("life in organized society, and especially in populous communities, involves an unavoidable clash of individual interests"); comment j (use of dynamite interfering with "use and enjoyment of land *in the vicinity*") (emphasis added); *see also* § 825, illustrations 1–4; § 829, illustrations 1–2; § 829A, illustrations 1–3; § 830, illustrations 1–4. The traditional rule in New Jersey is the same.

*Sarnicandro v. Lake Developers, Inc.*, 55 N.J.Super. 475, 481, 151 A.2d 48 (App.Div. 1959) (nuisance theory unavailing where "[t]he vendor created no danger to the public and did not interfere with adjoining land"); *see Philadelphia Electric Co. v. Hercules, Inc.*, 762 F.2d 303, 314 (3d Cir. 1985) (noting "the historical role of private nuisance law as a means of efficiently resolving conflicts between *neighboring* contemporaneous land users") (emphasis in original).

Amland maintains that the underlying rationale of these cases—that a successor landowner may not seek damages under a nuisance theory because of the doctrine of *caveat emptor*—was rejected by the Appellate Division in *T & E. See* Deft's Cross-Motion Br. at 52–53 (*citing T & E*, 227 N.J.Super. at 242, 546 A.2d 570). This argument fails for two reasons. First, *T & E* rejected *caveat emptor* in the context of a strict liability claim unless a plaintiff knowingly contracted to assume the abnormally dangerous risk. *T & E* did not reject *caveat emptor* in the context of a private nuisance claim, such as that asserted by Amland. Second, and more importantly, I do not accept Amland's view that only the doctrine of *caveat emptor* underlies Alcoa's argument against the imposition of liability for private nuisance. Alcoa's argument is, in fact, largely predicated on the long-standing inapplicability of nuisance law to successor landowner situations. *T & E*, relied upon by Amland, calls only for the application of strict liability as between successive landowners, and until a New Jersey court extends the nuisance rule to that situation as well, it is not the place of a federal court, in the first instance, to do

so. Because New Jersey courts have read private nuisance to encompass only instances of danger to the public or interference with use of adjoining land, Amland's claim here must fall.[24]

### 3. Public Nuisance

Amland seeks to demonstrate that the Edgewater plant constitutes a public nuisance in that it poses "an unreasonable interference with a right common to the general public." Restatement (2d) of Torts, § 821B(1); *see* Plff's Cross–Motion Br. at 55–56. Alcoa replies that, even assuming that the Edgewater plant amounts to public nuisance, Amland lacks standing to assert that claim. The parties agree that the standing issue is governed by the standard set forth in the Restatement.

> In order to recover damages in an individual action for a public nuisance, one must have suffered harm of a kind different from that suffered by other members of the public exercising the right common to the general public that was the subject of interference.

Restatement (2d) of Torts, § 821C(1).

This standard was applied by the Third Circuit in *Philadelphia Electric*, in which defendant sold a manufacturing plant to plaintiff, after defendant's operations there had resulted in the deposit on the property of various wastes. 762 F.2d at 306. In finding that plaintiff had no standing to assert that the wastes amounted to a public nuisance, the Third Circuit did not disagree that plaintiff's pecuniary harm—which resulted from cleanup costs— could be said to be "harm of a different kind from that suffered by the general

---

24. The cases cited by Amland involve either harm to a third party, *Hut v. Antonio*, 95 N.J.Super. 62, 66, 229 A.2d 823 (Law Div.1967) (liability where "the seller *created* a nuisance and it involves an unreasonable risk of harm to the public or a neighbor") (emphasis in original), or harm to neighboring property, *State, Dep't of Environmental Protection v. Exxon Corp.*, 151 N.J.Super. 464, 469–70, 376 A.2d 1339 (Ch.Div. 1977). As such, they do not support Amland's attempted extension of private nuisance law to disputes between successor landowners.

As noted by the Third Circuit, "[s]uch an extension of common law doctrine is particularly

hazardous in an area, such as environmental pollution, where Congress and the state legislatures are actively seeking to achieve a socially acceptable definition of rights and liabilities." *Philadelphia Electric*, 762 F.2d at 315. The New Jersey legislature, through, *inter alia*, ECRA and the New Jersey Spill Act, and the Supreme Court of New Jersey, through decisions such as *Ventron*, have attempted to distribute the liabilities arising from disposal of hazardous wastes. I will not risk disturbing those efforts by extending the law of private nuisance, absent guidance from the New Jersey courts on such an extension.

public." *Id.* at 316 (quoting Restatement § 821C(1)). The court went on, however, to hold that plaintiff did not suffer the harm in the exercise of the general public right that was the subject of the interference. The right of the public was to a pollution-free environment, and the contaminated manufacturing plant was the cause of the pollution, not the result of it. Thus, the facts did not disclose a business which suffered damage to its operations as a result of pollution to land or water, but instead disclosed "special[ ] harm only in the exercise of [plaintiff's] private property rights over the [contaminated] site." *Id.* Accordingly, the Third Circuit held, plaintiff had no standing to assert a public nuisance claim.

This reasoning has been adopted as indicative of New Jersey law. *See Jersey City Redevelopment Association v. PPG Industries,* 655 F.Supp. 1257, 1264–65 and n. 8 (D.N.J.1987). Amland argues that, in light of *Ventron* and *T & E,* "the New Jersey Supreme Court would recognize a public right to be free from the dangers of toxic waste disposal and would hold that cleanup costs and property value depreciation resulting from toxic waste disposal are damages suffered in the exercise of that public right." Plff's Cross–Motion Br. at 57. The right to be thus recognized would have to be the right of the public to be free from hazardous waste within a building site, even absent demonstrated harm to the soil or water; neither *Ventron* nor *T & E* goes this far, and this Court will not do so. The facts of this case—a subsequent landowner suffering pecuniary damage as a result of contamination of a purchased industrial facility—fall squarely within the *Philadelphia Electric* and *PPG* rule, and Amland may not assert a public nuisance claim.

### 4. *Negligence*

Amland contends that "New Jersey public policy mandates that, particularly in hazardous waste disposal matters, a realty vendor has ... a duty to warn its vendor and subvendees of any hazardous condition on the property that involves an unreasonable risk." Plff's Cross–Motion Br. at 59. None of the three sources relied upon by Amland to establish this duty are sufficient for that purpose and, therefore, no negligence claim is stated.

First, Amland relies upon Restatement (2d) of Torts, § 373. *See id.* at 58. That section, which states that liability may be imposed upon "[a] vendor of land who has created ... [an] artificial condition which involves an unreasonable risk of harm," specifically notes that the risk of harm must be "to others outside of the land." Restatement, § 373(1). The case before me evidences only a harm to Amland, the property's owner, and § 373, therefore, is inapplicable.

Second, Amland invokes Restatement § 353(1), which mandates that "[a] vendor of land who ... fails to disclose to his vendee any condition ... which involves unreasonable risk to persons or the land, is subject to liability to the vendee ... for physical harm caused by the condition after the vendee has taken possession." This section, on its face, appears intended to apply to situations in which a condition of land causes physical harm to an individual or the property, rather than to conditions which effect only pecuniary loss. *See* Deft's Common Law Reply Br. at 32. Moreover, the Restatement specifically limits liability by requiring a showing that "the vendee does not know or have reason to know of the condition or the risk involved," § 353(1)(a), and by permitting a seller to be "entitled to expect ... that the vendee will discover a condition which would be disclosed by such an inspection as the vendee should make before buying the land and taking possession of it." *Id.* comment d. Here, Amland was warned, before it took possession, that it should conduct a test for organics, including PCBs, and it failed to do so. Because Amland's inspection of the property was deficient, and because it had reason to know of likely toxic contamination, Amland's failure to test for PCBs precludes reliance on § 353.

Finally, Amland relies upon the lower court proceedings in *T & E,* in which a verdict was returned based upon the negligent failure of defendant to warn plaintiff, more than 40 years after the sale of the

property, of the radium waste present thereon. *See* Plff's Cross–Motion Br. at 61; *T & E,* 227 N.J.Super. at 238, 546 A.2d 570. Because the trial court vacated the negligence verdict solely on the basis of *caveat emptor,* and because the Appellate Division emphatically rejected the *caveat emptor* argument *vis-a-vis* the strict liability claim, the argument continues, the Appellate Division "implicitly endorsed the jury verdict" of negligent failure to warn. Plff's Cross–Motion Br. at 61. The Appellate Division, however, specifically limited its discussion, and its holding, to the strict liability claim, 227 N.J.Super. at 238, 546 A.2d 570, and I cannot find any implicit affirmance of the trial court's finding of a chargeable duty to warn. Because Amland points to no other authority to support this duty, and because neither the Restatement nor New Jersey caselaw has yet recognized such a duty under the circumstances here present, Amland's negligence claim cannot withstand Alcoa's summary judgment motion.

Counsel for Alcoa are to submit an appropriate order within ten days of the date of this opinion.